(No. 20962.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* STEPHEN NEMES, Plaintiff in Error.

*Opinion filed February 19, 1932.*

WILLIAM A. McINTYRE, for plaintiff in error.

· OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Per CURIAM: Stephen Nemes was indicted in the criminal court of Cook county for the crime of rape committed upon Helen Flynn. He pleaded not guilty, waived trial by jury, was tried by the court, convicted, and sentenced to imprisonment in the penitentiary, and has sued out a writ of error.

The plaintiff in error, who was thirty-five years of age, was a broker, whose business was directing selling-campaigns of stock and bond issues of corporations. He did have sexual intercourse with Helen Flynn, who was a young woman twenty-two years of age, at his office on the ninth floor of the London Guarantee building, in Chicago, at about 5:30 o'clock in the afternoon of October 24, 1930. The only ultimate question of fact in the case is whether the act occurred with her consent or forcibly and against her will.

The prosecuting witness testified that she came to Chicago from a convent when she was thirteen years old and had lived in Chicago for the last nine years. She worked for the telephone company for seven years. She had not lived at home for about a year and had been out of employment for six or seven months. Her aunt kept her and she lived on the proceeds of telephone stock which she had bought while working for the company. She went to the Allerton House the night before this occurrence, registered as Helen Flynn, of Wisconsin, paid for her room with

money obtained from the night watchman at the Tribune building and went back on the 24th and he gave her two dollars more. She was unemployed at the time. On October 24, while she was on Michigan avenue, near Wacker drive, between 10:00 and 11:00 o'clock in the morning, she was accosted by the plaintiff in error, who claimed to have seen her at the Tribune building the night before and asked where she was going. She told him that she was going "to interview some jobs." He asked, "Where?" She had notations concerning the jobs in her hand, one concerning employment as a waitress. He said that she was too nice a girl for a waitress. She said it was immaterial as long as she was making a living. He asked what salary she wanted. She said, "Fifteen dollars a week." He said, "I can give you twenty-five dollars a week." She said, "That all depends," meaning, she testified, if she could do the work he assigned her to. They went to his office. He started to give her details about the job but did not finish and decided they should have lunch, which they had in the restaurant in the same building. Nemes introduced her to John B. Finucan, who asked her if she wanted a job, and Nemes kicked her under the table and said he had hired her and was going to pay her $25 a week. Nemes left the table and she and Finucan went upstairs alone to Nemes' office, where he joined them about five minutes later, about 12:30. The office had three rooms —one public and two private offices. She went to the office on the right-hand side, and while she and Nemes were talking two men came in. Nemes, Finucan and the two men went into the other office and she remained alone from about 1:00 o'clock until between 5:15 and 5:30. During that time Nemes entered the office about three times. Once he said, "I will be with you in a minute." The third time he said she could step into his office, and she went into his office on the left-hand side. She went through the little office into the other. There was no one in the

outer office at the time. She remained standing, her eyes toward the window and her back to the door. There was a desk and a chair in the left-hand office, near the door. She did not know where Nemes was. She was standing there quite a while before he came to her. While she was standing there, suddenly she felt someone grab her. She turned and saw it was Nemes. He looked quite flushed and she saw that he was exposed. She turned around and screamed and he hit her head against the wall. She did not notice whether the blow that struck her head against the wall was a heavy one or not. Nobody came to the door when she screamed. With the shock of it she does not remember anything. When she came to she found herself lying on the floor and Nemes lying on her, and with that she screamed and he pulled her up and told her to be quiet. When she came to she felt a terribly sharp pain at a place which she indicated, and when Nemes pulled her up she felt something running down her leg and she took a handkerchief out of her pocket and wiped it off. Nemes had a towel in his hand and he was walking around the room. After that they went out of the office together and down-stairs in the elevator. There was no one else in the elevator but the operator. When they got down-stairs Nemes said, "You let me go ahead," and she said, "Go on." He went ahead and when she got to the door he had disappeared in the crowd. She did not see him again. She went over to the Tribune building and after sitting there awhile asked the officer where the women's lavatory was. She went to the lavatory and noticed blood all over her legs. She had three or four clean handkerchiefs, which she used to wipe her legs, then threw them away and fixed her hair, trying to look presentable. She also washed out her underwear. She was in the lavatory about an hour and a half. She then went down-stairs, sat there for awhile and then went to the watchman and asked him what was the nearest hospital and if St. Luke's

was the nearest. He told her he could direct her to another one, and while he was talking to her the man came in with the Tribune papers. He went in with the papers and left her to decide for herself, so she took a cab and went to St. Luke's Hospital. There a man sitting at the desk asked her what she wanted. He was Dr. Hess, and after examining her he called the police. She left the Tribune building at about a quarter to nine.

Dr. Hess testified that he examined the prosecuting witness on the evening of October 24, 1930, at the examining room of St. Luke's Hospital. She came to the hospital and made the statement that she had been attacked and wished to be examined, because she noticed there was some blood in the region of those parts, which she wanted examined. He made an examination and found on first inspection that the entrance to the vagina was covered with small shreds of blood clot, and upon wiping away this substance he observed a laceration of the hymen, from the edges of which oozed fresh blood. He made a finger insertion in course of the examination and found that the entrance was made with considerable pain. In his opinion the condition could have been caused by the insertion of a male organ into the entrance. He had no opinion whether the woman had been penetrated before. The hymen was freshly torn.

The defendant testified that he saw the prosecuting witness on October 24 in the Tribune Tower, at the advertising counter. Before he reached the Tribune counter she approached from the back. It was about 12:30. She asked if he was about to put an advertisement in the paper for help, and he asked her what she could do. She told him she was a stenographer and had been employed by the telephone company for seven years. He told her that he did not think he could do her any good as he did not have an opening but that he would introduce her to a man he was going to see at room 904, at 360 North Michigan avenue.

She said she could not remember the address and they walked out to the sidewalk and he pointed out the London Guarantee building and said, "It is in room 904 in that building." She said, "Well, can't you take me there?" He said, "Well, yes; I can take you there." So they walked together into the building and went up to his office, where he introduced her to Finucan in the reception room. A man was waiting for witness and he went into conference with him for about three-quarters of an hour. Miss Flynn and Finucan had gone into the right-hand office. After his conference he saw Miss Flynn sitting alone and asked her how she was getting along. She replied, "Splendidly." Another man came to see witness, and he told Miss Flynn that it seemed he was busy and for her to come back some other time. She said if it did not make any difference to him she would stay, because she had no special place to go. He went into his private office for conference for about an hour. He asked Miss Flynn if she would not come back some other time when he was not so busy—that he wanted to go out. He had not had his lunch and he asked her to go along with him. They went down to the lobby of the building and he asked her if she did not want to come in and eat—have a cup of coffee—and she accepted and they sat down at a table. Finucan came in just after they had finished eating and witness went up to his office alone. A man was waiting for him. He was in conference with him for a long time. He did not invite Miss Flynn back to his office. He was in his private office in conference for a long time. His stenographer came into the office at ten minutes to five and he told her if she had nothing else to do she could go, and she went home. When the men left, Miss Flynn came into his office. He asked her what she was doing. He thought she had left. She said she wanted to see him—to tell him something; that she did not have any money and was homeless and what she had told him before was not true, and she asked him for five dollars.

He asked her, "What for?" She said, taking hold of the lapel of his coat, "Well, I will treat you right," and he said, "All right." They had intercourse in the usual way. She got upon the desk and partly undressed. He looked in his purse and gave her a dollar, all the money he had. He thought he had a five-dollar bill but he only had a dollar. She said, "A rich man like you only giving me a dollar; why, the man in the Tribune Tower gave me two-and-a-half-dollars last night." They left the building and walked about a block and a half south together. He told her he had to go home for dinner at 6:00 o'clock and said good-bye to her.

These accounts of the occurrence are wholly irreconcilable. There were other offices on the same floor of the building. The defendant says Miss Flynn made no outcry. After they separated she walked back to the Tribune building and remained there for two hours. She made no complaint either going down in the elevator, on the street or at the Tribune building and did not appear agitated or crying. Those with whom she talked in the Tribune building did not see anything at all wrong, and she was calm while talking with them. She went to the hospital about 9:00 o'clock. She said she did not want Nemes reported but wanted the affair kept quiet and did not know her going to the hospital would cause all the trouble it did. However, she told Dr. Hess that she had been assaulted and wished to be examined, and he called the police.

John B. Finucan testified that he knew Nemes and first saw him on October 24, 1930, in the lunch room about 12:30. Miss Flynn was with him. Nemes introduced witness and said, "This girl is going to put $15,000 in the business," or something like that, and that was all. Witness remained with them about five minutes and went up to the office with Miss Flynn. He was in Nemes' office about 5:00 o'clock. Nemes and Miss Flynn were there and no one else. Witness left in about three minutes. Nemes

and Miss Flynn remained in the office. His testimony does not agree with that of either party.

The evidence in the case is conflicting on almost every material point. The defendant and Miss Flynn met either in the street or at the Tribune counter. One addressed the other and the two went together to the defendant's office. The defendant says they went together to his office and there he introduced her to Finucan in the reception room and went into conference for about three-quarters of an hour with a man who was waiting for him. After this conference he saw Miss Flynn sitting in the office alone, but another man claimed his attention for about an hour. It was then the middle of the afternoon and he had not had his lunch. He asked Miss Flynn to come along with him, and when they got down to the lobby he asked her if she did not want to come in and eat. She did so. Finucan came in just after they had finished eating and Nemes went up to his office alone. Finucan's testimony is different. He testified that he saw Nemes and Miss Flynn together in the lunch room about 12:30. Nemes introduced him, and they had the conversation in which Nemes said she was going to put $15,000 in the business. Finucan was with them about five minutes and went up to Nemes' office with Miss Flynn. He remained there an hour or two but was back about 5:00 o'clock for about three minutes and left, leaving Nemes and Miss Flynn in the office alone. Then, according to Nemes' testimony, she came into his office, told him that she had no money, was homeless and what she had told him was not true and asked him for five dollars, and, as he put it on cross-examination, he told her he was not giving away any money, and she told him she would treat him right. Thereupon they had intercourse and he gave her a dollar. If the transaction was a bargain and sale of that kind of course it was not rape. On the other hand, if he seized her as she testified, bumped her head violently against the wall, and by reason of the blow or

fright, or both combined, or other cause, she became unconscious and he had intercourse with her in that condition, the act was rape.

In cases of this kind, where the injured person testifies to the commission of the crime, evidence of her complaint soon after the injury has occurred, or at the first opportunity, is competent, not to prove the commission of the act but to corroborate the testimony of the witness. It is an exception to the general rule which excludes hearsay evidence. In this case the prosecuting witness rode down to the street in the elevator with the defendant. They were the only passengers in the car, but there was an operator to whom complaint might have been made. There were people in the lobby, and, no doubt, many people and some police officers were on the street. At the Tribune building, where she was for two or three hours, she talked with several persons, among them the watchman who had befriended her and given her money and who directly contradicted her as to the reason she gave him for wishing to go to a hospital, but they noticed nothing unusual in her appearance or conduct and she made no complaint until she went to the hospital, three or four hours after the alleged assault. There she told Dr. Hess that she had been assaulted and wanted to have an examination. She testified that she did not want the matter made public and did not know that her visit to the hospital would cause all this trouble. It is evident that while at the Tribune building she became alarmed by reason of the continued bleeding and thought it necessary to have medical treatment, and at the hospital, in order to obtain an examination and treatment, it was necessary for her to give some explanation of her condition. Her statement to the doctor, under all the circumstances of the case, cannot be held corroborative of her further than that she did have sexual intercourse with some man. The complaint itself must be a spontaneous expression of intense feeling as the result of the outrage, and

not a mere recital of a past event, to entitle it to any probative force. (*People* v. *Hamilton*, 268 Ill. 390.) Her statement was not the spontaneous statement which weighs as corroborative of her testimony as to the defendant's guilt. She testified that "I remained at the office from about 10:30 until about 5:30 or quarter to six. Mr. Nemes never said anything out of the way in all that time. He kept his distance, just like a business man does," and that he made the assault upon her in the manner described without saying a word. There is some inherent improbability in her testimony that Nemes, under all the circumstances, should suddenly make a felonious attack upon her without saying a word and without first attempting to ascertain if his desires could not be satisfied without resort to force. There is no evidence that any of her clothing was torn or disarranged or that there were any marks of violence on her body where she claims he grabbed her, or upon her head, which she claims was so violently struck against the wall as to render her unconscious.

It is contended by the State that as this case was tried before the court without a jury its finding is to be given the same weight as the verdict of a jury, and unless it is palpably and manifestly against the weight of the evidence it will not be set aside by a reviewing court. Much has been said in varying language as to the force and effect of the verdict of a jury upon a reviewing court. From a careful consideration and analysis of the authorities we find the true rule to be educed in a criminal case where a verdict of guilty by a jury, or a similar finding by a court when a jury is waived, when the same is brought before a court of review for consideration upon the facts, is, that it is the duty of the reviewing court to give a careful, independent consideration to the evidence, giving due weight to the fact that the court or jury saw and heard the witnesses, and if after such consideration the court does not regard the evidence in the record, by reason of its improbability, unrea-

sonableness, unsatisfactory character, or any other reason arising from a consideration of the evidence, to be sufficient to remove all reasonable doubt and create an abiding conviction that the defendant is guilty, it is the duty of the court to reverse the judgment of conviction. *People v. Fitzgibbons,* 343 Ill. 69; *People v. Freeland,* 284 id. 190; *People v. Wallace,* 279 id. 139; *People v. McMahon,* 254 id. 62.

The evidence in this record, when weighed by the rule laid down in the cases cited and other cases, is not of that clear, satisfactory and conclusive character as to convince us of plaintiff in error's guilt beyond a reasonable doubt.

The judgment of the criminal court is reversed and the cause remanded.

*Reversed and remanded.*