**People of the State of Illinois, Plaintiff-Appellee, v. Dewey Blevins, Defendant-Appellant.**

**Gen. No. 51,487.**

First District, Third Division.

July 15, 1968.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Paul Bradley and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Alan Gersh, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE SULLIVAN delivered the opinion of the court.

Defendant was indicted for the offense of rape and after trial before a court without a jury was found guilty. He was sentenced to one to ten years in the Illinois State Penitentiary. Defendant contends only that he was not proven guilty beyond a reasonable doubt.

On May 23, 1964, Leontine Boon, a 16-year-old girl, who was born in Belgium but who had lived in Chicago for ten years before the occurrence, was picked up at her home at about 8:30 p. m. and taken to a party. One Elmer Neace, who was supposed to be her escort for the evening, called for her at her home in a car driven by another boy. The defendant sat in the front seat with the driver and Elmer Neace and the complaining witness sat in the back seat. After making one other stop, to pick up other people before going to the party, the group went to an apartment at 1644 Humboldt in Chicago where a birthday party took place. The version of the complaining witness follows.

She arrived at a sparsely furnished apartment at the Humboldt address. A group of young people were in the apartment drinking beer and whiskey, and playing records. Elmer, her escort, gave her a drink. She denied drinking any of it. The others present in the apartment were listening to music, necking and talking. At about 11:00 p. m. her escort left the party and did not return, despite the fact that he had been told that she had to be home at 11:30 p. m. She testified that she had no conversation with the defendant prior to this time, but at that time she saw people beginning to leave through the back and front doors. She started to get up but the defendant grabbed her by the arm. According to her testimony the defendant told her "he had eyes for me all night and if (she) didn't do what he wanted that (she) would be in trouble. He said he would get me home in a cab if I would do what he told me to." The defendant grabbed her by the arm and pulled her down on the couch

and slapped her on the jaw. Defendant then picked up the complaining witness and carried her into the bedroom. She was asked how many people were present at the time of this conversation and the complaining witness replied that she did not remember anyone being there. She testified that she bit and scratched the defendant and, further, that she screamed. The defendant then hit her several times, tore off her blouse and then held her down by placing his elbow on her throat, and tore off her girdle. While in the bedroom Miss Boon told the defendant she was an epileptic and needed water. The defendant let her up and she went into the bathroom and put some water on her face. The defendant then took a wet washcloth and put it on her face and said, "How does that feel?" She said, "All right." She said, "Let me go home," and he said, "No."

Miss Boon testified that she is not an epileptic.

According to Miss Boon, the defendant then resumed his attack and threatened to kill her if she did not stop kicking and biting him, and the defendant then committed the alleged rape. After the alleged rape the defendant said he was going to take a shower and proceeded to do so. Miss Boon, when she heard the shower running, got up, straightened her skirt and threw her girdle into her purse. She then asked the defendant where the cigarettes were. He told her they were on the TV. She then walked out of the apartment and ran down the stairs. She also testified that after leaving the apartment she walked about a block and fell over some bushes; that there were people around. She told them to call the police and they gave her a drink and a cigarette. She was taken to the County Hospital where she saw a doctor but she did not say anything to the doctor and the doctor did not say anything to her.

There were about fifteen to twenty people at the party.

She further testified that there were just a few scratches on her neck, although the defendant punched

174

her on the jaw "real hard." She also stated that he did not leave a mark on her.

On cross-examination the complaining witness admitted there were no marks on her face. The complaining witness was then asked the following question: "Did you ask him to use a condom, yes or no?" Answer, "I asked him so he would get up and get one so I could get out." The following question was put to the complaining witness and was answered in the following manner: Question, "How many rubbers were used, lady?" Answer, "I don't even know if that one was used."

Detective Richard Austin, the investigating officer, stated that at the time he first saw the complaining witness during the early morning hours of May 24, 1964, her blouse had a couple of buttons missing, she complained of a sore jaw and that there were marks on her neck. He arrested the defendant during the morning hours of May 24 at his apartment at 1644 North Humboldt.

The officer testified that he saw no scratches or marks of any kind on the defendant's face. He further testified that after photographing and fingerprinting the defendant it was ascertained that he had no prior police record. The defendant admitted to the officer that he had intercourse with Miss Boon but denied that she had resisted and stated that a contraceptive was used.

The defendant testified that he was 21 years of age at the time of the occurrence, had received an honorable discharge from the army and had never been arrested except for traffic offenses. He first met the complaining witness about May 24, 1964, when he was in a car also occupied by Elmer Neace, who escorted her to a party. The apartment was shared by the defendant, Elmer Neace and one James Rosebalm. At the party he served Miss Boon one or two drinks which she started to drink but he did not know whether or not she finished them. During the party defendant sat on a chair and Miss Boon

sat on the arm of the chair. They had a periodic conversation. When the party began to break up Elmer Neace wanted to borrow some money and Elmer, James Rosebalm and Miss Boon walked into the bedroom with the defendant. The defendant gave Elmer the money. At that time the defendant told Miss Boon that he would take her home and she agreed it would be all right. After Neace and Rosebalm left, the defendant and Miss Boon began necking on the bed and defendant took off Miss Boon's blouse. He believed that other people were still in the house at that time although they were gone later when he left the bedroom. The complaining witness said to the defendant, "If we do anything you are going to have to use a rubber." He also testified that she took off her own girdle and that any marks he put on her would have been during intercourse and would have been on her neck. Defendant further testified that he kissed her many times, and that she did not resist him, scream or shout, nor did she bite or scratch him. He denied punching her in the jaw, or using any other violence, and stated he used a contraceptive. The intercourse was on the bed and he had to go into the bathroom to get the contraceptive. During this time she remained on the bed. After the intercourse defendant said he laid on the bed and talked to Miss Boon, and then told her he would take a shower after which he would take her home. While he was taking a shower she called to him and asked if he had a cigarette. He replied they were on the television set. He testified that she also brought him a cigarette while he was in the shower and later when he emerged from the bathroom she was gone. Defendant further testified that prior to having intercourse Miss Boon asked for some water and he went and got it. From the defendant's testimony it would indicate that the defendant went to the kitchen to obtain a wet washcloth; that the kitchen was some 50 feet from the bedroom and the complaining witness remained on the bed. None of the

doors in the apartment were locked at any time during that period.

 The defendant testified that he did not know the whereabouts of Elmer Neace or James Rosebalm at the time of the trial. The trial took place nearly two years after the occurrence.

In People v. Perez, 412 Ill 425, 427, 107 NE2d 749, the court said:

> "To sustain a conviction for forcible rape, it must be proved that the act was against the will of the victim, and that penetration occurred. (People v. Ardelean, 368 Ill 274.) It is undisputed here that penetration occurred, and that the act took place. The only point of contention is whether the act was against the will of the girl.

> "It has been observed that an accusation of rape is easily made, hard to be proved, and still harder to be defended by one ever so innocent. Hence, a reviewing court is charged with the duty of carefully examining the evidence in such a case. People v. Scott, 407 Ill 301."

██ The point confronting us is whether the act of intercourse was performed against the will of the girl. Where there is a conflict of testimony the court must look to the surrounding circumstances in an effort to determine the truth. The complaining witness in her testimony stated that she saw people starting to leave through the back and front doors all at the same time that she was grabbed by the defendant; that he then pulled her onto the couch and hit her in the jaw—suddenly there were no people present. It is argued by the defendant that all the people apparently left in the time that it took defendant to say two sentences, because the complaining witness testified that after this conversation she did not remember anyone being in the apartment. The complaining witness also testified that

177

the defendant was beating her viciously at one moment and the next moment he was wiping her face with a wet washcloth and asked her if it felt all right. The complaining witness also admitted that the defendant complied with her request to use a contraceptive, although she stated later she was not sure whether a contraceptive had been used. She, however, admitted having asked the defendant to use a contraceptive and that a contraceptive was present.

Is it plausible to believe that a man who is intent on committing rape would be sufficiently concerned to wipe the victim's face with a wet washcloth when she allegedly told him she was an epileptic and use a contraceptive for her protection? Despite the alleged vicious attack upon her by the defendant no effort was made by her to escape. Detective Austin testified that he saw no marks on the defendant, yet the complaining witness had testified about striking, scratching and biting the defendant. She even testified that she had scratched him with her fingernails. The only marks noted by Detective Austin were some marks on her neck. These marks could as well have been left on her neck while they were making love to each other as from any other cause. Indeed, these marks could have been made when she fell over some bushes after leaving the apartment. The complaining witness did not testify to any violence on the part of the defendant which would have produced marks on her neck.

When Detective Austin went to the apartment the following morning the doors were unlocked and the defendant was asleep on the couch. Is it likely that a man, who has recently committed a rape, would go to sleep at the scene of the crime and await his arrest by the police?

Defense counsel asked the complaining witness whether or not she asked the defendant to use a condom. Her answer was that she had asked him to get one so that

178

he would get up and she could get out. She then testified that defendant did not get up but admitted that there was a contraceptive present.

The State argued that the complaining witness testified that the defendant threatened to kill her and told her, "You won't be the first." That the complaining witness had been overcome by superior force and had struggled to no avail. This is certainly not supported by the record.

The State concludes by arguing that in the defendant's mind, when the complaining witness succumbed, it was equivalent to her voluntarily taking part in the sex act. With this argument we cannot agree. There are too many unexplained inconsistencies in the testimony of the complaining witness which leave a reasonable doubt as to the guilt of the defendant.

The State also argues that Detective Austin testified that there were marks on the victim's neck and that the victim's blouse was torn and ripped, as the complaining witness had testified. The blouse was not produced at the trial. One explanation as to why the blouse may have been ripped is that she had fallen over some bushes after leaving the apartment.

Another matter which creates a doubt in the mind of the court is the fact that the complaining witness testified that she was taken to the County Hospital for an examination. She testified that she said nothing to the doctor and the doctor said nothing to her. The doctor was not called to testify to any bruises or scratches on the complaining witness. Nor is it explained why this evidence was injected into the case.

■ The State cites the case of People v. Greer, 28 Ill2d 107, 190 NE2d 742, together with other cases, holding that the testimony of a single witness is sufficient to support a conviction, if the jury believed the evidence and it is not so unsatisfactory as to leave a reasonable doubt of the guilt of the accused. In this case, based

179

upon the testimony and surrounding circumstances as they existed at the time of the occurrence and immediately prior thereto, we conclude that the evidence is so unsatisfactory as to leave no basis for a finding of guilty beyond a reasonable doubt.

The defendant was 21 years of age, and had received an honorable discharge from the army after having served three years in Korea and Thailand. His only arrests were for two traffic violations while he was in the army.

For the foregoing reasons the conviction must be reversed.

Judgment reversed.

DEMPSEY, P. J. and SCHWARTZ, J., concur.