THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES E. SECRET, Defendant-Appellant.

First District (2nd Division)   No. 63151

Opinion filed November 8, 1977.

PUSATERI, J., dissenting.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Renee G. Goldfarb and Jerome A. Saxon, of counsel), for the People.

Mr. PRESIDING JUSTICE DOWNING delivered the opinion of the court:

This appeal presents the classical issue in many rape cases, consent vs. force. Following a jury trial, the defendant was found guilty of rape (Ill. Rev. Stat. 1973, ch. 38, par. 11—1) and deviate sexual assault (Ill. Rev. Stat. 1973, ch. 38, par. 11—3) but not guilty of aggravated kidnapping. Defendant was sentenced to not less than 7 nor more than 21 years. The critical issue is whether the evidence established defendant's guilt beyond a reasonable doubt.

On January 8, 1975, the complainant arrived at a Chicago lounge about 9 p.m. About one hour later defendant arrived. Because of an encounter with the defendant at the same lounge on January 4, 1975, complainant was scared and attempted to reach her husband by telephone. Unable to reach her husband and without money, she called her sister-in-law and

thereafter called for a cab. Sometime later a cab arrived, but because the driver was drunk, complainant did not take the cab. Later she went outside to hail a cab, when the defendant grabbed her, telling the cab driver to leave. A struggle ensued when defendant hit complainant in the jaw, knocking her down. The defendant then pulled the complainant to his nearby apartment.

According to complainant, upon her refusing defendant's order to take off her clothes, the defendant grabbed her blouse, bra, slacks, and panties. The complainant then took off her clothes, the defendant his, and thereafter the defendant forced the complainant to have intercourse, submit to an act of cunnilingus, and to perform an act of fellatio. Sometime later, upon defendant falling asleep, complainant got up, put on some clothing, and left. She then proceeded directly to a nearby police station where, about 7 a.m. on January 8, 1975, she talked with Chicago policewoman Denise Roberts.

Officer Roberts testified that the complainant, very agitated, nervous and upset, was wearing a pair of yellow slacks, very dirty, with the zipper not in too good condition, and a yellow blouse that had two buttons on the front which she held closed. The complainant told Roberts that she had been at the defendant's apartment from around 1:30 a.m. to 7 a.m., and that she had been forced to perform sexual acts, including oral copulation.

Although the complainant could not remember the address of the defendant's apartment, she led the police to the location. When defendant answered the door for the police, he was advised of his rights and told he was under arrest for rape. When told who the complainant was, the defendant said, "I got a little rough with her last night and she might be mad." To an investigating police officer, the defendant, who is 6'5", 270 lbs., stated the complainant willingly went to the defendant's apartment and willingly had intercourse with him that night, claimed that she was his girl friend and that he had bought her a dress, and stated he previously had intercourse with her on about five occasions.

The complainant was examined at a nearby hospital. It was stipulated by the parties at trial that the doctor who examined the complainant at about 10:50 a.m. on January 8, 1975, noted the presence of sperm in the vagina and a small amount of swelling in the pelvic region. The complainant testified that the doctor examined her jaw and then gave her something to rinse out her mouth. Although the complainant testified the defendant hit her more than five times during the night in her head, there is no medical evidence of such.

The owner-bartender of the lounge testified that the complainant and defendant left the lounge about six seconds apart about 1:30 a.m. Fifteen

minutes later they were standing on the street about three doors down from the lounge.

The defendant did not testify. However, the defendant presented the following evidence. The owner-bartender of the lounge testified that on at least seven occasions he saw the complainant and defendant in the lounge together; that they did not come in together; that they acted like any other two persons would ordinarily act; and that he had never seen them argue. He further testified that on one occasion he saw complainant in front of his lounge chasing her husband with a bottle, and he tried to break it up; that complainant and defendant left together that night because they left six seconds apart and the door never closed between them; and he never saw complainant make a telephone call on the night in question.

A lady patron of the lounge, who had known the defendant for about one year and one-half, testified that approximately a month or a month and one-half before the date in question, she saw complainant and defendant together; that they double dated one night; that she saw them dancing a few times; and that she and her friend brought them home from the dance in the same car about 1:30 a.m., and they were kissing in the back seat. The complainant testified she met the defendant through a girl friend and had known him for about a month and one-half.

Another female witness testified that she was at a boutique about a month before the incident and saw defendant buy the complainant a dress; that the witness used to work in a cleaners store in the building in which defendant lived and the defendant would stop and talk. The complainant denied that defendant ever purchased a dress for her.

I.

The overriding issue here is the resolution of the question whether the evidence is so unsatisfactory, improbable, or implausible so as to raise a reasonable doubt of the defendant's guilt, thereby requiring the reviewing court to substitute its judgment for that of the jury. *People v. Reese* (1973), 54 Ill. 2d 51, 58, 294 N.E.2d 288.

There is no question that during the approximately five hours the complainant and defendant were at the latter's apartment the morning of January 8, 1975, they had intercourse. The complainant testified that she was forced to go to the apartment and forced to engage in the acts of intercourse and fellatio, and that an act of cunnilingus was performed. On the other hand, it is the defendant's contention, as told to an investigating police officer, that the complainant willingly engaged in the act of intercourse. There is no evidence to dispute the acts of fellatio and cunnilingus.

To establish the unsatisfactory, improbable, and implausible quality of the State's case, the defendant contends that: (1) the complainant lied when she stated she did not go to the washroom while at the police station; (2) she lied about her blouse being torn on the street; (3) she contradicted her previous story when she denied, on the witness stand, that defendant was bothering her in the lounge; (4) she described the alleged assault one way at the police station and another way on the witness stand; her story about being battered by the defendant was contradicted by the physical evidence; (5) she contradicted her previous story when she stated in court that defendant had ripped and torn her clothes off; (6) the only witness vouched for by both sides contradicted her story on six points; and (7) the complainant's testimony concerning her association with the defendant was contradicted by two witnesses.

■■ Each of the enumerated points involves conflicts in the testimony. Under such circumstances it becomes a question of the weight, if any, to give to particular evidence and the credibility of the witnesses. Under our system of jurisprudence, these issues are for the jury's determination. Our supreme court has clearly held in *People v. Novotny* (1968), 41 Ill. 2d 401, 411-12, 244 N.E.2d 182, and numerous other cases, that evidence sufficient to establish guilt beyond a reasonable doubt, if believed by the trier of fact, is sufficient to sustain the conviction. It also held that when a trier of fact renders a decision based upon credible and substantial evidence, a reviewing court may not assume the role of the trier of fact in assessing the weight of the evidence. The principles enunciated in the *Novotny* decision is still the law in Illinois. See *People v. Todorovic* (1st Dist. 1977), 53 Ill. App. 3d 1, 368 N.E.2d 471.

The record in this case indicates that the complainant's testimony was thoroughly and exhaustively cross-examined by defendant's competent and experienced trial counsel. The slacks and blouse worn by the complainant on the date in question were admitted into evidence, were the subject of considerable argument by the attorneys, and were taken to the jury room during their deliberations. The jury also heard the testimony as state witnesses of the complainant's husband and sister-in-law, the owner-bartender of the lounge, and two Chicago police persons. The defendant also called the owner-bartender of the lounge and two witnesses whose testimony indicated that the complainant and defendant were on a friendly basis prior to the events of January 8, 1975. All of these witnesses, including the complainant, were subjected to very thorough cross-examination. The final arguments covered every point raised by the defendant in his list of seven issues specified earlier in this opinion. Thus every issue now raised on appeal was competently and exhaustively argued to the jury.

The jury was charged by the trial court in the instructions that it was the

sole judge of the credibility of the witnesses and of the weight to be given to this testimony: it was advised that "a male person of the age of fourteen years or older who has sexual intercourse with a female, not his wife, by force and against her will, commits the crime of rape"; and that "by force and against her will" means "that under the circumstances, the female did not voluntarily consent to sexual intercourse." Thus the jury by its verdict, after considering the testimony and evidence, believed the complainant's testimony that the act of sexual intercourse was by force, against her will, and that she "did not voluntarily consent to it." The same is true of the charge of deviate sexual conduct, namely the jury concluded that the defendant, by force or threat of force, compelled the complainant to perform or submit to acts of deviate sexual conduct.

So now the question is whether there is credible and substantial evidence to support the jury's verdict. There is no dispute that the complainant and defendant had intercourse on January 8, 1975, and that on that date they were not man and wife. The complainant testified that she had an encounter with the defendant on January 4, 1975—she had known him for about one month and considered him a friend—when defendant forced her to go to his apartment and told her "* * * he wanted some pussy." When defendant discovered she was in her menstrual period, the defendant said, "there will be another time" and permitted her to leave. The complainant told her husband that "some big dude had been messing with her," whereupon her husband told her to stop going to the club.

The complainant returned to the club about 9 p.m. on January 8, 1975. The defendant arrived about one hour later. Seeing the defendant, the complainant became scared and called a cab. When the driver arrived, she thought he was too drunk to drive. She unsuccessfully attempted to contact her husband. She contacted her sister-in-law about 10:30 p.m., who told her to take a cab and come to where the sister-in-law was. About 1:30 a.m., when defendant walked to the back of the lounge, the complainant left. Defendant followed her about six seconds later. Outside she flagged down a cab, but defendant grabbed her and told the cab driver to leave. The defendant refused to let her go. She freed herself and ran, screaming, toward some lights with defendant chasing her. Upon catching her, the defendant hit her on the jaw, a struggle followed, and defendant threatened to kill her. Because defendant had "something" in his pocket, she did nothing further to attract attention. The defendant pulled her across the street, tore her blouse, and pulled her to his nearby apartment building. In the apartment he told her to take off her clothes and then hit her. The defendant grabbed her blouse, bra, slacks, and panties and tore them, whereupon the complainant removed them. Thereafter the acts of intercourse, cunnilingus, and fellatio took place. At

that time complainant was in the sixth day of her menstrual period which usually lasted nine days. After defendant fell asleep, the complainant dressed and proceeded directly to a nearby police station where, at about 7 a.m., she reported the incident.

The complainant appeared at the police station immediately after leaving the defendant's presence. At the police station, according to policewoman Roberts, she appeared nervous, agitated, and upset; her clothes were torn, bloody, and buttons were missing. A medical examination revealed the presence of sperm and a swelling of the pelvic region. This evidence corroborates the testimony of the complainant. (See *People v. DeFrates* (1946), 395 Ill. 439, 444-45, 70 N.E.2d 591; compare *People v. Morrow* (1st Dist. 1971), 132 Ill. App. 2d 293, 300, 270 N.E.2d 487.) And, of course, the defendant admitted to the police when they first contacted him, "I got a little rough with her last night and she might be mad."

In sum, the defendant's contention relies upon the theory that because a charge of rape is easy to make and hard to defend, the law requires that where the accused denies it, the testimony of the complainant must either be corroborated or be clear and convincing (*People v. Mueller* (1954), 2 Ill. 2d 311, 313, 118 N.E.2d 1), and it is the duty of the reviewing court not only to consider the evidence carefully, but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt (*People v. Faulisi* (1962), 25 Ill. 2d 457, 461, 185 N.E.2d 211). The defendant did not take the stand to deny the charge of force. The dissenting opinion states that the complainant and defendant (a) "enjoyed extensive prior existing relationships," and that (b) there was a "past history of social and personal relationships." We suggest a reading of the record does not support such an interpretation, but even if it did, this was a dispute in the evidence which the jury resolved.

■■ However, as our supreme court has said in *People v. Reese* (1973), 54 Ill. 2d 51, 57-58, 294 N.E.2d 288, "The court may not encroach upon the function of the trier of fact to weigh credibility and otherwise assess the evidence which was presented. [Citation.] That evidence has been conflicting will not justify a reversal of a finding by the trier of fact." The inconsistencies relied upon by defendant were thoroughly articulated to the jury. Thus it was for the jury to evaluate and resolve the testimony and inconsistencies. (See *People v. Wilson* (1953), 1 Ill. 2d 178, 187, 115 N.E.2d 250.) The mere fact that the evidence is conflicting will not justify reversal. (*People v. Davis* (1957), 10 Ill. 2d 430, 443, 140 N.E.2d 675; *People v. Brown* (1st Dist. 1975), 32 Ill. App. 3d 182, 187, 336 N.E.2d 523.) We have reviewed the testimony and arguments to the jury in this case. We cannot say that the State's evidence is so palpably contrary to the jury's verdict or so unreasonable, improbable, or unsatisfactory as to

cause reasonable doubt as to the guilt of the accused. (*Reese*, 54 Ill. 2d 53, 58.) We have not seen the witnesses; nor have we seen the defendant who, although not a witness, was before the jury. We have not seen the exhibits, though the jury did. Based on the record before us, it is not our duty or privilege, merely because this is a rape charge, to substitute our judgment as to the weight of the disputed evidence or the credibility of the witnesses for the jury who heard and saw the evidence presented and observed the demeanor of the witnesses. (*People v. Novotny*, 41 Ill. 2d 401, 412.) We think that the State's evidence, if believed by the jury, was sufficient to establish the defendant's guilt beyond a reasonable doubt. For these reasons the judgment of the circuit court of Cook County is affirmed.

Affirmed.

PERLIN, J., concurs.

Mr. JUSTICE PUSATERI, dissenting:

Nearly one hundred years ago, Justice Stephen Field observed: "When we take our seats on the bench we are not struck with blindness, and forbidden to know as judges what we see as men." (*Ho Ah Kow v. Nunan* (D.C. Cal. 1879), 12 F. Cas. 252, 255.) With all due respect, I believe the majority, by their action in the instant case, ignores this sage advice.

Preliminarily, I must acknowledge concurrence with the views recently expressed by the highest court of our land:

> "We do not discount the seriousness of rape as a crime. It is highly reprehensible, both in a moral sense and in its almost total contempt for the personal integrity and autonomy of the female victim and for the latter's privilege of choosing those with whom intimate relationships are to be established. * * *" (*Coker v. Georgia* (1977), ___ U.S. ___, ___, 53 L. Ed. 2d 982, 992, 97 S. Ct. 2861, 2868.)

I am also most cognizant of the fact that in most instances, the personal violation of the rape victim results in hatred, fear, shame, depression and an injured ego that must be cured with time and by professional aid. However, after carefully reviewing the facts in the case at bar, I cannot agree that the aforementioned is applicable to the prosecutrix, Brenda Sanders.

My brethren in the majority state that this appeal presents the classical issue in many rape cases, consent versus force. However, there is another facet of this case which defies this characterization. The prosecutrix and defendant in this case were not strangers. Quite to the contrary, this situation involves two adult individuals with a past history of social and

personal relationships culminating with their spending an evening together in a bar, and then going to an apartment where they so remained for five hours until 7 o'clock in the morning.

Brenda, the prosecutrix, arrived at the M & L Lounge, located on the south side of Chicago, at approximately 9 p.m. on January 8, 1975, the evening in question and stayed there for approximately 4½ to 5½ hours. She frequented the lounge approximately three times a week and in fact, testified that she first met "Charles," the defendant, there about a month and a half prior to the evening in question. She further testified that she was introduced to Charles through a girl friend of hers and that she had considered him a friend.

Ellen Hall testified that she had seen Brenda and Charles together at the Packinghouse Lounge, also located on the south side of Chicago, in November of 1974. Ms. Hall saw them "dancing together a few times." She further stated that on this occasion, Brenda and Charles left together, shared the back seat of Ms. Hall's boyfriend's car and further, that she observed Brenda and Charles "kissing in the back seat."

A Ms. Nina Smith, testified that she saw Charles and Brenda together at a Toni's Boutique, located in the City of Chicago, about a month before this incident, and that Charles purchased a brown-like color dress for Brenda at that time.

Brenda testified that she had been to the defendant's apartment on January 4, 1975, just a few days before the occurrence. Although she testified that on that occasion Charles had hustled her through the door of the bar, grabbed her by the arm and pulled her across the street to his apartment, she had to be asked three times if she was threatened before she acknowledged any threat, and then concluded, "maybe what he was mumbling was a threat to me"; there was also no evidence that he prevented her from leaving. Brenda's husband James, testified that after he had been informed of this incident, that he had advised Brenda "to stop going up there," and to "just stay away from there."

Thus, despite her husband's warnings, her alleged fear of the defendant and her knowledge that the defendant frequented the M & L Lounge, Brenda returned to this lounge on January 5, 1975, and again on January 8, 1975.

As a reviewing court, it is our duty to very carefully examine the evidence in a rape case. Although commonly reiterated, Lord Hale's admonition is once again appropriate to espouse; that an accusation of rape is easily made, difficult to be proved, and still more difficult to be defended by one ever so innocent. (3 Greenleaf on Evidence §212 (1892); 1 Hale's Pleas of the Crown 634 (1800).) Accordingly, the testimony of the prosecutrix must be scrutinized with caution. Where, as in the case at bar, the evidence offered substantially discredits and impeaches the truth of

the prosecutrix's statements, her testimony must be corroborated. (*People v. Fitzgibbons* (1931), 343 Ill. 69, 174 N.E. 848; *People v. Bolik* (1909), 241 Ill. 394, 89 N.E. 700; *People v. Blanch* (1923), 309 Ill. 426, 141 N.E. 146.) In the case at bar, not only was Brenda's testimony so impeached and contradicted as to be lacking in verisimilitude, but of equal import was that it was uncorroborated by other witnesses who were present and in the position to know and speak the truth.

Brenda testified that on the evening in question, she arrived at the M & L Lounge at 9 p.m. She further stated that upon the defendant's arrival she telephoned her "sister-in-law," Irene Cady. It should be noted that both Brenda's and Ms. Cady's credibility regarding this incident became questionable upon Ms. Cady's subsequent testimony. Ms. Cady testified on direct examination that Brenda's husband James was her brother, making Brenda her sister-in-law. On cross-examination, she stated that she previously had not told the truth and that James was not her brother. In an attempt to explain her initial characterization, Ms. Cady stated on redirect that she and James were "raised up together," which eventually only turned out to mean that they attended the same school.

Ms. Cady also testified that she advised Brenda, in response to her complaint that "a man was looking at her," to take a cab to another bar, where Ms. Cady was working. Furthermore, it is from Ms. Cady's testimony that we are made aware of the fact that Brenda came to the M & L Lounge with little if any money; since Brenda told Irene Cady that she couldn't afford to take a cab to this other bar, whereupon Ms. Cady offered to pay for the fare. Hence, Brenda's purported fears manifest themselves as merely feelings of ambivalence as exemplified by her subsequent actions. On one hand we have a woman who purports to be innocently going to a lounge and who later claims to have been violently raped through no fault on her part. Yet, the objective facts illustrate that the prosecutrix went to a lounge without money, with the likelihood that the defendant would be there, and in derogation of her husband's admonition that she not go to the lounge. She thereafter remained at this lounge for approximately five hours, and even more astonishingly remained there for three hours after the defendant's arrival and her phone call to Ms. Cady requesting her assistance.

Only one witness was called by both the prosecution and defense, Mack White, the owner of the M & L Lounge. He testified that Brenda and Charles were in his lounge at the same time on at least seven other occasions; that they always acted friendly towards each other in his presence and that he never saw them have an argument. He also testified that only a few weeks before this incident, around Christmas, that he intervened in a fight between Brenda and her husband; Brenda had been chasing her husband with a bottle.

Specifically regarding the evening in question, Mr. White's testimony directly contradicted Brenda's in a number of important respects. He testified that Brenda and Charles left the M & L Lounge together that evening; that he was sure Brenda made no phone calls that evening since "I was sitting right in front of her and she never moved"; that Brenda was sitting one bar stool away from the defendant the entire evening; that no cab pulled in front of the lounge; and that Brenda did not scream or get knocked down since he observed the defendant and Brenda standing outside his lounge and if she had screamed he would have heard her.

In addition, numerous other inconsistencies and improbabilities appearing in the record enhance the incredibility of the prosecutrix's claim that any force was used against her by the defendant. While there is no unalterable rule establishing what particular acts will prove that carnal knowledge of a woman was against her will, the evidence must show such resistance as will demonstrate that the act was in fact against her will. *People v. Eccarius* (1922), 305 Ill. 62, 68, 136 N.E. 651.

Brenda testified that the defendant tore her bra, slacks and the side of her panties. Policewoman Roberts testified that Brenda did not say that the defendant ripped or tore her clothing, but rather that he pulled them off of her. Brenda also claimed that Charles picked her up by her coat collar and that her coat was torn under her arm. Yet, absent the slacks and blouse, none of these articles of clothing were produced at trial to corroborate the prosecutrix's testimony. The failure to produce the purported victim's clothing at trial has been particularly noted by our supreme court in reversing convictions of rape. See *People v. Szybeko* (1962), 24 Ill. 2d 335, 181 N.E.2d 176; *People v. Silva* (1950), 405 Ill. 158, 89 N.E.2d 800.

Similarly, there was much contradiction regarding the condition of Brenda's blouse. Policewoman Roberts stated that there were no buttons on Brenda's blouse at the time she was interviewed. In court Ms. Roberts testified that the blouse had one button on it. On cross-examination, she testified that the buttons were loosened. The defense described the blouse as having buttons still on it and suggested that the buttons were neatly removed; there being no loose threads left behind or much evidence of tearing. Brenda testified that two buttons fell off when the defendant grabbed her in the street and that two more fell off at the defendant's apartment. However, the buttons were not produced at trial and while the blouse was impounded, there was insufficient evidence establishing a chain of custody. Brenda had ample time from the moment she left Charles' apartment, and subsequently again from the time she left the hospital until the police finally came to her home, to make any changes in the condition of her clothing that she deemed appropriate.

In the realm of incredulous testimony, Brenda testified that the

defendant hit her more than five times that evening. She stated some of these blows were on the side of her head and on her arms; she also stated that he struck her "hard" in the jaw with his fist. However, the evidence showed that Brenda was not bleeding when she went to the hospital, nor was she treated for bruises and there was no mention of bruises made in the medical report. Clearly, a man of the defendant's stature and build, six foot five inches tall and 270 pounds, would have caused more injury to the prosecutrix if he had beaten her as she described.

Our courts have repeatedly held that the production of medical evidence or lack thereof, and specifically the failure to call any medical witnesses is a significant corroborative factor demonstrating whether the act was against the prosecutrix's will. (See *People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211; *People v. Kepler* (1st Dist. 1966), 76 Ill. App. 2d 135, 221 N.E.2d 801; *People v. Appleby* (1st Dist. 1968), 104 Ill. App. 2d 207, 244 N.E.2d 395.) In *People v. Faulisi*, the court in reversing a rape conviction noted "* * * The complaining witness also testified that she was sent by the police to a doctor for an examination, but that she did not complain of any injuries to the doctor. The doctor did not appear as a witness." (25 Ill. 2d 457, 461.) Likewise in *People v. Qualls* (1961), 21 Ill. 2d 252, 258, 171 N.E.2d 612, the court stated that "* * * There was no evidence of any other force, nor of bruises, marks, abrasions or contusions upon her body. There was no testimony by an examining doctor. * * *" Again in *People v. Nemes* (1932), 347 Ill. 268, 277, 179 N.E. 868, the court stated "* * * There is no evidence that any of her clothing was torn * * * or that there were any marks of violence on her body where she claims he grabbed her, or upon her head, which she claims was so violently struck against the wall as to render her unconscious."

However, even if Brenda's testimony concerning her injuries was not impugned, our supreme court has held that evidence that the prosecutrix suffered a broken jaw after her encounter with a readily identifiable assailant was insufficient corroboration of rape in itself. The court noted in *People v. Szybeko* (1962), 24 Ill. 2d 335, 339-40:

> "* * * we see little corroboration in the testimony of such witnesses, particularly when it is laid along side the many circumstances which weaken the prosecutrix's claim of outraged virtue.
>
> * * *
>
> Nor do we see satisfactory corroboration of rape in the medical testimony that the prosecutrix had a broken jaw * * *."

While the law does not require the prosecutrix to resist a defendant in a situation where such efforts would be futile, there are a number of other factors, in the case at bar, which detract from the plausibility of Brenda's assertion that she resisted at all.

Brenda claims that she was beat up and dragged across the street to the defendant's apartment. Yet there was no evidence of her outcry except for her own statement. Neither the owner of the lounge nor any of the neighbors heard her scream. One would reasonably suppose that a woman who was being assaulted would have cried for help, and that her outcry would have been heard by someone in the neighborhood. See *People v. Silva* (1950), 405 Ill. 158, 164, 89 N.E.2d 800, wherein the court noted that "[t]he circumstances pertaining to her outcry * * * leave that question in considerable doubt," since the evidence failed to indicate that the prosecutrix was in any way restrained from making a complaint.

In addition, Brenda claims that the sexual excesses that she indulged in against her will transpired over the course of the five hours she spent in the defendant's apartment. However, her description of the occurrence leaves many voids and unaccounted for hours. In *People v. DeFrates* (1965), 33 Ill. 2d 190, 195, 210 N.E.2d 467, the court stated: "* * * What is more, it is difficult to conceive that such a fear would have consumed her for the entire two hours that was spent in the bedroom before she allegedly perpetrated a ruse to escape." Our supreme court also noted in *People v. Scott* (1950), 407 Ill. 301, 305, 95 N.E.2d 315, that "From her description of the occurrence, and the five hours of sexual excesses which she claims then transpired, it is clear that, however reluctantly begun, the sexual acts were engaged in without any resistance whatsoever on the part of the prosecutrix." Moreover, in *People v. Kazmierczyk* (1934), 357 Ill. 592, 594, 192 N.E. 657, the court was concerned that the prosecutrix only accounted for "* * * one hour and fifteen minutes of the three hours and a half that she remained in the apartment."

Brenda contends that the defendant performed an act of cunnilingus against her will, even though on the night in question she was in the sixth day of her nine day menstrual period. She further states that the defendant beat her and forced her to perform an act of fellatio on him, and yet testified that the defendant offered to take her to the hospital. It should be noted preliminarily that the hospital report made no mention of the fact that she was having a menstrual period and in addition, to believe that the defendant would in one instant perpetrate heinous acts upon the prosecutrix and in the next moment act benevolently towards her taxes one's credulity. This situation is illustrative of the events in *People v. Blevins* (1st Dist. 1968), 98 Ill. App. 2d 172, 178, 240 N.E.2d 434, 437, wherein the court in questioning similar conduct stated: "Is it plausible to believe that a man who is intent on committing a rape would be sufficiently concerned to wipe the victim's face with a wet washcloth * * *?" See also *People v. Carruthers* (1942), 379 Ill. 388, 392, 41 N.E.2d 521.

While Brenda testified that she went directly to the police station upon

leaving the defendant's apartment, at approximately 7:00 a.m., to make a complaint to the police, the events preceding her action clearly destroys the significance of her complaint. Furthermore, Brenda's making an immediate complaint to the police instead of going home, may be accounted for by a belated sense of guilt occurring when her dalliance unintentionally extended into the daylight hours and her absence from home would need to be explained to an imagined irate husband. See *People v. DeFrates* (1965), 33 Ill. 2d 190, 196.

While there was a stipulation as to the presence of spermatozoa on the prosecutrix's vagina as well as a small amount of swelling in her pelvic region, it has been held that the mere presence of spermatozoa alone is only evidence of a recent act of intercourse and the small amount of swelling in her pelvic region may well have been the result of a merely vigorous sex act which did not in any way establish whether the intercourse was forceful. *People v. Kepler* (1st Dist. 1966), 76 Ill. App. 2d 135, 221 N.E.2d 801; *People v. Reed* (1st Dist. 1977), 55 Ill. App. 3d 397, 371 N.E.2d 57.

In addition, the majority opinion states that the prosecutrix's claim of forcible rape is corroborated by the defendant's statement made to the investigating police officer that Brenda might be mad at him since he got a little "rough with her last night." However, this statement made by the defendant could hardly be considered an admission or confession particularly since he stated that the prosecutrix willingly went to his apartment that night and willingly had sexual intercourse with him. The defendant further stated that Brenda was his girl friend, that he had bought her a dress on a previous occasion, and that he had had intercourse with her on five prior occasions.

Moreover, even assuming *arguendo* that the statements made by the defendant were in any way considered an admission or confession, it would be insufficient corroboration of the prosecutrix's claim in the case at bar. In this respect our supreme court stated in *People v. Hubbard* (1967), 38 Ill. 2d 104, 110-11, 230 N.E.2d 220:

> "* * * we do not agree that the evidence of the oral confession is sufficient to uphold the conviction. * * *
>
> Notwithstanding the admissibility of the confession, * * * we are of the opinion that it was not sufficiently corroborated to support the conviction * * * we [have] held that if there is evidence of corroborating circumstances which tend to prove the *corpus delecti* and correspond with the circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the *corpus delecti* is sufficiently proven in a given case * * *. Here, however, the evidence supporting the confession is so weak as to defy belief,

and we cannot, therefore, reasonably state that it gives any corroboration to it."

The majority emphasizes that in a case of this nature, it is for the jury to resolve the testimony and inconsistencies therein; however, it is equally our duty to carefully consider all of the evidence and reverse a judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt. See *People v. Qualls* (1961), 21 Ill. 2d 252, 171 N.E.2d 612; *People v. Abbate* (1932), 349 Ill. 147, 181 N.E. 615; *People v. Faulisi* (1962), 25 Ill. 2d 457, 185 N.E.2d 211.

The majority in support of its position cites *People v. Davis, People v. Brown* and *People v. Wilson.* However, I find these cases to be inapposite as they have one element in common which pervades throughout and which distinguishes them from the case at bar, they involve acts occurring in a violent manner, between complete strangers. Thus in *Davis*, the defendant, a complete stranger, entered the residence of a 14-year-old girl at 3 a.m., told her that he would "cut her guts out if she didn't lay down and shut up," and threatened to kill her brother, if she didn't submit. In *Brown*, the defendant, also a complete stranger, entered the complainant's home shortly past 3 a.m., carried a knife and told her "not to scream or he would kill her." Finally, in *Wilson*, the prosecutrix was a nurse who was returning home at approximately 10:30 p.m. whereupon her assailant seized her from behind, placed one arm around her throat, his hand on her mouth and dragged her through a hedge where a struggle ensued. The prosecutrix testified that she had no recollection of what had transpired thereafter until she found herself in the emergency room of South Chicago Community Hospital.

In the case at bar, Brenda and Charles were not strangers, but in fact enjoyed extensive prior existing relationships that included at the minimum, dancing, kissing in the back seat of a car, accepting gifts of clothing, spending evenings together in a bar on at least seven previous occasions, being in the defendant's apartment on at least one prior occasion, and which included infinitely more if we also consider the statement that Charles made to the police at the time of his arrest. See *People v. Houck* (1st Dist. 1977), 50 Ill. App. 3d 274, 365 N.E.2d 576.

For all of the aforementioned reasons, I do not believe that defendant was proven guilty beyond a reasonable doubt and I would reverse the judgment of conviction in this case.