# STATE OF MARYLAND v. EDWARD SALVATORE RUSK

[No. 142, September Term, 1979.]

*Decided January 13, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Stephen H. Sachs, Attorney General,* with whom were *Deborah K. Handel* and *Kathleen M. Sweeney, Assistant Attorneys General,* on the brief, for appellant.

*Ira C. Cooke,* with whom were *Melnicove, Kaufman & Weiner, P.A.* on the brief, for appellee.

MURPHY, C. J., delivered the opinion of the Court. SMITH, DIGGES and COLE, JJ., dissent. COLE, J., filed a dissenting Opinion at page 247 *infra,* which SMITH and DIGGES, JJ., concur.

Edward Rusk was found guilty by a jury in the Criminal

Court of Baltimore (Karwacki, J. presiding) of second degree rape in violation of Maryland Code (1957, 1976 Repl. Vol., 1980 Cum. Supp.), Art. 27, § 463 (a) (1), which provides in pertinent part:

> "A person is guilty of rape in the second degree if the person engages in vaginal intercourse with another person:
>
> (1) By force or threat of force against the will and without the consent of the other person; . . . ."

On appeal, the Court of Special Appeals, sitting *en banc,* reversed the conviction; it concluded by an 8 — 5 majority that in view of the prevailing law as set forth in *Hazel v. State,* 221 Md. 464, 157 A.2d 922 (1960), insufficient evidence of Rusk's guilt had been adduced at the trial to permit the case to go to the jury. *Rusk v. State,* 43 Md. App. 476, 406 A.2d 624 (1979). We granted certiorari to consider whether the Court of Special Appeals properly applied the principles of *Hazel* in determining that insufficient evidence had been produced to support Rusk's conviction.

At the trial, the 21-year-old prosecuting witness, Pat, testified that on the evening of September 21, 1977, she attended a high school alumnae meeting where she met a girl friend, Terry. After the meeting, Terry and Pat agreed to drive in their respective cars to Fells Point to have a few drinks. On the way, Pat stopped to telephone her mother, who was baby sitting for Pat's two-year-old son; she told her mother that she was going with Terry to Fells Point and would not be late in arriving home.

The women arrived in Fells Point about 9:45 p.m. They went to a bar where each had one drink. After staying approximately one hour, Pat and Terry walked several blocks to a second bar, where each of them had another drink. After about thirty minutes, they walked two blocks to a third bar known as E. J. Buggs. The bar was crowded and a band was playing in the back. Pat ordered another drink and as she and Terry were leaning against the wall, Rusk approached and said "hello" to Terry. Terry, who was then conversing with another individual, momentarily

interrupted her conversation and said "Hi, Eddie." Rusk then began talking with Pat and during their conversation both of them acknowledged being separated from their respective spouses and having a child. Pat told Rusk that she had to go home because it was a week-night and she had to wake up with her baby early in the morning.

Rusk asked Pat the direction in which she was driving and after she responded, Rusk requested a ride to his apartment. Although Pat did not know Rusk, she thought that Terry knew him. She thereafter agreed to give him a ride. Pat cautioned Rusk on the way to the car that " 'I'm just giving a ride home, you know, as a friend, not anything to be, you know, thought of other than a ride;' " and he said, " 'Oh, okay.' " They left the bar between 12:00 and 12:20 a.m.

Pat testified that on the way to Rusk's apartment, they continued the general conversation that they had started in the bar. After a twenty-minute drive, they arrived at Rusk's apartment in the 3100 block of Guilford Avenue. Pat testified that she was totally unfamiliar with the neighborhood. She parked the car at the curb on the opposite side of the street from Rusk's apartment but left the engine running. Rusk asked Pat to come in, but she refused. He invited her again, and she again declined. She told Rusk that she could not go into his apartment even if she wanted to because she was separated from her husband and a detective could be observing her movements. Pat said that Rusk was fully aware that she did not want to accompany him to his room. Notwithstanding her repeated refusals, Pat testified that Rusk reached over and turned off the ignition to her car and took her car keys. He got out of the car, walked over to her side, opened the door and said, " 'Now, will you come up?' " Pat explained her subsequent actions:

> "At that point, because I was scared, because he had my car keys. I didn't know what to do. I was someplace I didn't even know where I was. It was in the city. I didn't know whether to run. I really didn't think, at that point, what to do.
>
> "Now, I know that I should have blown the horn. I should have run. There were a million things I

could have done. I was scared, at that point, and I didn't do any of them."

Pat testified that at this moment she feared that Rusk would rape her. She said: "[I]t was the way he looked at me, and said 'Come on up, come on up;' and when he took the keys, I knew that was wrong."

It was then about 1 a.m. Pat accompanied Rusk across the street into a totally dark house. She followed him up two flights of stairs. She neither saw nor heard anyone in the building. Once they ascended the stairs, Rusk unlocked the door to his one-room apartment, and turned on the light. According to Pat, he told her to sit down. She sat in a chair beside the bed. Rusk sat on the bed. After Rusk talked for a few minutes, he left the room for about one to five minutes. Pat remained seated in the chair. She made no noise and did not attempt to leave. She said that she did not notice a telephone in the room. When Rusk returned, he turned off the light and sat down on the bed. Pat asked if she could leave; she told him that she wanted to go home and "didn't want to come up." She said, " 'Now, [that] I came up, can I go?' " Rusk, who was still in possession of her car keys, said he wanted her to stay.

Rusk then asked Pat to get on the bed with him. He pulled her by the arms to the bed and began to undress her, removing her blouse and bra. He unzipped her slacks and she took them off after he told her to do so. Pat removed the rest of her clothing, and then removed Rusk's pants because "he asked me to do it." After they were both undressed Rusk started kissing Pat as she was lying on her back. Pat explained what happened next:

> "I was still begging him to please let, you know, let me leave. I said, 'you can get a lot of other girls down there, for what you want,' and he just kept saying, 'no'; and then I was really scared, because I can't describe, you know, what was said. It was more the look in his eyes; and I said, at that point — I didn't know what to say; and I said, 'If I do what you want, will you let me go without killing me?'

"Because I didn't know, at that point, what he was going to do; and I started to cry; and when I did, he put his hands on my throat, and started lightly to choke me; and I said, 'If I do what you want, will you let me go?' And he said, yes, and at that time, I proceeded to do what he wanted me to."

Pat testified that Rusk made her perform oral sex and then vaginal intercourse.

Immediately after the intercourse, Pat asked if she could leave. She testified that Rusk said, " 'Yes,' " after which she got up and got dressed and Rusk returned her car keys. She said that Rusk then "walked me to my car, and asked if he could see me again; and I said, 'Yes;' and he asked me for my telephone number; and I said, 'No, I'll see you down Fells Point sometime,' just so I could leave." Pat testified that she "had no intention of meeting him again." She asked him for directions out of the neighborhood and left.

On her way home, Pat stopped at a gas station, went to the ladies room, and then drove "pretty much straight home and pulled up and parked the car." At first she was not going to say anything about the incident. She explained her initial reaction not to report the incident: "I didn't want to go through what I'm going through now [at the trial]." As she sat in her car reflecting on the incident, Pat said she began to "wonder what would happen if I hadn't of done what he wanted me to do. So I thought the right thing to do was to go report it, and I went from there to Hillendale to find a police car." She reported the incident to the police at about 3:15 a.m. Subsequently, Pat took the police to Rusk's apartment, which she located without any great difficulty.

Pat's girlfriend Terry corroborated her testimony concerning the events which occurred up to the time that Pat left the bar with Rusk. Questioned about Pat's alcohol consumption, Terry said she was drinking screwdrivers that night but normally did not finish a drink. Terry testified about her acquaintanceship with Rusk: "I knew his face, and his first name, but I honestly couldn't tell you — apparently I ran into him sometime before. I couldn't tell you how I know him. I don't know him very well at all."

Officer Hammett of the Baltimore City Police Department acknowledged receiving Pat's rape complaint at 3:15 a.m. on September 22, 1977. He accompanied her to the 3100 block of Guilford Avenue where it took Pat several minutes to locate Rusk's apartment. Officer Hammett entered Rusk's multi-dwelling apartment house, which contained at least six apartments, and arrested Rusk in a room on the second floor.

Hammett testified that Pat was sober, and she was taken to City Hospital for an examination. The examination disclosed that seminal fluid and spermatazoa were detected in Pat's vagina, on her underpants, and on the bed sheets recovered from Rusk's bed.

At the close of the State's case-in-chief, Rusk moved for a judgment of acquittal. In denying the motion, the trial court said:

> "There is evidence that there is a taking of automobile keys forcibly, a request that the prosecuting witness accompany the Defendant to the upstairs apartment. She described·a look in his eye which put her in fear.

> "Now, you are absolutely correct that there was no weapon, no physical threatening testified to. However, while she was seated on a chair next to the bed, the Defendant excused himself, and came back in five minutes; and then she testifies, he pulled her on to the bed by reaching over and grabbing her wrists, and/or had her or requested, that she disrobe, and assist him in disrobing.

> "Again, she said she was scared, and then she testified to something to the effect that she said to him, she was begging him to let her leave. She was scared. She started to cry. He started to strangle her softly she said. She asked the Defendant, that if she'd submit, would he not kill her, at which point he indicated that he would not; and she performed oral sex on him, and then had intercourse."

Rusk and two of his friends, Michael Trimp and David Carroll, testified on his behalf. According to Trimp, they went in Carroll's car to Buggs' bar to dance, drink and "tr[y] to pick up some ladies." Rusk stayed at the bar, while the others went to get something to eat.

Trimp and Carroll next saw Rusk walking down the street arm-in-arm with a lady whom Trimp was unable to identify. Trimp asked Rusk if he needed a ride home. Rusk responded that the woman he was with was going to drive him home. Trimp testified that at about 2:00 — 2:30 a.m. he returned to the room he rented with Rusk on Guilford Avenue and found Rusk to be the only person present. Trimp said that as many as twelve people lived in the entire building and that the room he rented with Rusk was referred to as their "pit stop." Both Rusk and Trimp actually resided at places other than the Guilford Avenue room. Trimp testified that there was a telephone in the apartment.

Carroll's testimony corroborated Trimp's. He saw Rusk walking down the street arm-in-arm with a woman. He said "[s]he was kind of like, you know, snuggling up to him like. . . . She was hanging all over him then." Carroll was fairly certain that Pat was the woman who was with Rusk.

Rusk, the 31-year-old defendant, testified that he was in the Buggs Tavern for about thirty minutes when he noticed Pat standing at the bar. Rusk said: "She looked at me, and she smiled. I walked over and said, hi, and started talking to her." He did not remember either knowing or speaking to Terry. When Pat mentioned that she was about to leave, Rusk asked her if she wanted to go home with him. In response, Pat said that she would like to, but could not because she had her car. Rusk then suggested that they take her car. Pat agreed and they left the bar arm-in-arm.

Rusk testified that during the drive to her apartment, he discussed with Pat their similar marital situations and talked about their children. He said that Pat asked him if he was going to rape her. When he inquired why she was asking, Pat said that she had been raped once before. Rusk expressed his sympathy for her. Pat then asked him if he

planned to beat her. He inquired why she was asking and Pat explained that her husband used to beat her. Rusk again expressed his sympathy. He testified that at no time did Pat express a fear that she was being followed by her separated husband.

According to Rusk, when they arrived in front of his apartment Pat parked the car and turned the engine off. They sat for several minutes "petting each other." Rusk denied switching off the ignition and removing the keys. He said that they walked to the apartment house and proceeded up the stairs to his room. Rusk testified that Pat came willingly to his room and that at no time did he make threatening facial expressions. Once inside his room, Rusk left Pat alone for several minutes while he used the bathroom down the hall. Upon his return, he switched the light on but immediately turned it off because Pat, who was seated in the dark in a chair next to the bed, complained it was too bright. Rusk said that he sat on the bed across from Pat and reached out

> "and started to put my arms around her, and started kissing her; and we fell back into the bed, and she — we were petting, kissing, and she stuck her hand down in my pants and started playing with me; and I undid her blouse, and took off her bra; and then I sat up and I said 'Let's take our clothes off;' and she said, 'Okay;' and I took my clothes off, and she took her clothes off; and then we proceeded to have intercourse."

Rusk explained that after the intercourse, Pat "got uptight."

> "Well, she started to cry. She said that — she said, 'You guys are all alike,' she says, 'just out for,' you know, 'one thing.'
>
> "She started talking about — I don't know, she was crying and all. I tried to calm her down and all; and I said, 'What's the matter?' And she said, that she just wanted to leave; and I said, 'Well, okay;'

and she walked out to the car. I walked out to the car. She got in the car and left."

Rusk denied placing his hands on Pat's throat or attempting to strangle her. He also denied using force or threats of force to get Pat to have intercourse with him.

In reversing Rusk's second degree rape conviction, the Court of Special Appeals, quoting from *Hazel,* 221 Md. at 469, noted that:

"Force is an essential element of the crime [of rape] and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety."

Writing for the majority, Judge Thompson said:

"In all of the victim's testimony we have been unable to see any resistance on her part to the sex acts and certainly can we see no fear as would overcome her attempt to resist or escape as required by *Hazel.* Possession of the keys by the accused may have deterred her vehicular escape but hardly a departure seeking help in the rooming house or in the street. We must say that 'the way he looked' fails utterly to support the fear required by *Hazel.*" 43 Md. App. at 480.

The Court of Special Appeals interpreted *Hazel* as requiring a showing of a reasonable apprehension of fear in instances where the prosecutrix did not resist. It concluded:

"we find the evidence legally insufficient to warrant a conclusion that appellant's words or actions created in the mind of the victim a reasonable fear that if she resisted, he would have harmed her, or that faced with such resistance, he would have used force to overcome it. The prosecutrix stated that she was afraid, and submitted because of 'the look in his eyes.' After both were undressed and in the bed, and

> she pleaded to him that she wanted to leave, he started to lightly choke her. At oral argument it was brought out that the 'lightly choking' could have been a heavy caress. We do not believe that 'lightly choking' along with all the facts and circumstances in the case, were sufficient to cause a reasonable fear which overcame her ability to resist. In the absence of any other evidence showing force used by appellant, we find that the evidence was insufficient to convict appellant of rape." *Id.* at 484.

In argument before us on the merits of the case, the parties agreed that the issue was whether, in light of the principles of *Hazel,* there was evidence before the jury legally sufficient to prove beyond a reasonable doubt that the intercourse was "[b]y force or threat of force against the will and without the consent" of the victim in violation of Art. 27, § 463 (a) (1). Of course, due process requirements mandate that a criminal conviction not be obtained if the evidence does not reasonably support a finding of guilt beyond a reasonable doubt. *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980). However, as the Supreme Court made clear in *Jackson v. Virginia,* 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979), the reviewing court does not ask itself whether *it* believes that the evidence established guilt beyond a reasonable doubt; rather, the applicable standard is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in original).

The vaginal intercourse once being established, the remaining elements of rape in the second degree under § 463 (a) (1) are, as in a prosecution for common law rape (1) force — actual or constructive, and (2) lack of consent. The terms in § 463 (a) (1) — "force," "threat of force," "against the will" and "without the consent" — are not defined in the statute, but are to be afforded their "judicially determined meaning" as applied in cases involving common law rape.

*See* Art. 27, § 464E.[1] In this regard, it is well settled that the terms "against the will" and "without the consent" are synonymous in the law of rape.[2]

*Hazel,* which was decided in 1960, long before the enactment of § 463 (a) (1), involved a prosecution for common law rape, there defined as "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim." 221 Md. at 468-69. The evidence in that case disclosed that Hazel followed the prosecutrix into her home while she was unloading groceries from her car. He put his arm around her neck, said he had a gun, and threatened to shoot her baby if she moved. Although the prosecutrix never saw a gun, Hazel kept one hand in his pocket and repeatedly stated that he had a gun. He robbed the prosecutrix, tied her hands, gagged her, and took her into the cellar. The prosecutrix complied with Hazel's commands to lie on the floor and to raise her legs. Hazel proceeded to have intercourse with her while her hands were still tied. The victim testified that she did not struggle because she was afraid for her life. There was evidence that she told the police that Hazel did not use force at any time and was extremely gentle. Hazel claimed that the intercourse was consensual and that he never made any threats. The Court said that the issue before it was whether "the evidence was insufficient to sustain the conviction of rape because the conduct of the prosecutrix was such as to render her failure to resist consent in law." *Id.* at 468. It was in the context of this evidentiary background that the Court set forth the principles of law which controlled the

---

**1.** Section 464E provides as follows:

"Undefined words or phrases in this subheading which describe elements of the common-law crime of rape shall retain their judicially determined meaning except to the extent expressly or by implication changed in this subheading."

**2.** *See, e.g.,* McDonald v. State, 225 Ark. 38, 279 S.W.2d 44 (1955); Wilson v. State, 49 Del. 37, 109 A.2d 381 (1954), *cert. denied,* 348 U.S. 983, 75 S. Ct. 574, 99 L. Ed. 765 (1955); Commonwealth v. Goldenberg, 338 Mass. 377, 155 N.E.2d 187, *cert. denied,* 359 U.S. 1001, 79 S. Ct. 1143, 3 L. Ed. 2d 1032 (1959); State v. Catron, 317 Mo. 894, 296 S.W. 141 (1927); State v. Carter, 265 N.C. 626, 144 S.E.2d 826 (1965); Commonwealth v. Stephens, 143 Pa. Super. 394, 17 A.2d 919 (1941); R. Perkins, *Perkins on Criminal Law,* 160-61 (2d ed. 1969).

disposition of the case. It recognized that force and lack of consent are distinct elements of the crime of rape. It said:

> "Force is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety. But no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend upon the prevailing circumstances. As in this case force may exist without violence. If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim — having regard to the circumstances in which she was placed — a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force." *Id.* at 469.

As to the element of lack of consent, the Court said in *Hazel:*

> "[I]t is true, of course, that however reluctantly given, consent to the act at any time prior to penetration deprives the subsequent intercourse of its criminal character. There is, however, a wide difference between consent and a submission to the act. Consent may involve submission, but submission does not necessarily imply consent. Furthermore, submission to a compelling force, or as a result of being put in fear, is not consent." *Id.*

The Court noted that lack of consent is generally established through proof of resistance or by proof that the victim failed to resist because of fear. The degree of fear necessary to obviate the need to prove resistance, and thereby establish lack of consent, was defined in the following manner:

> "The kind of fear which would render resistance by a woman unnecessary to support a conviction of

rape includes, but is not necessarily limited to, a fear of death or serious bodily harm, or a fear so extreme as to preclude resistance, or a fear which would well nigh render her mind incapable of continuing to resist, or a fear that so overpowers her that she does not dare resist." *Id.* at 470.

*Hazel* thus made it clear that lack of consent could be established through proof that the victim submitted as a result of fear of imminent death or serious bodily harm. In addition, if the actions and conduct of the defendant were reasonably calculated to induce this fear in the victim's mind, then the element of force is present. *Hazel* recognized, therefore, that the same kind of evidence may be used in establishing both force and nonconsent, particularly when a threat rather than actual force is involved.

The Court noted in *Hazel* that the judges who heard the evidence, and who sat as the trier of fact in Hazel's non-jury case, had concluded that, in light of the defendant's acts of violence and threats of serious harm, there existed a genuine and continuing fear of such harm on the victim's part, so that the ensuing act of sexual intercourse under this fear " 'amounted to a felonious and forcible act of the defendant against the will and consent of the prosecuting witness.' " In finding the evidence sufficient to sustain the conviction, the Court observed that "[t]he issue of whether the intercourse was accomplished by force and against the will and consent of the victim was one of credibility, properly to be resolved by the trial court." 221 Md. at 470.

*Hazel* did not expressly determine whether the victim's fear must be "reasonable." Its only reference to reasonableness related to whether "the acts and threats of the defendant were reasonably calculated to create in the mind of the victim . . . a real apprehension, due to fear, of imminent bodily harm . . . ." 221 Md. at 469. Manifestly, the Court was there referring to the calculations of the accused, not to the fear of the victim. While *Hazel* made it clear that the victim's fear had to be genuine, it did not pass upon whether a real but unreasonable fear of imminent death or serious

bodily harm would suffice. The vast majority of jurisdictions have required that the victim's fear be reasonably grounded in order to obviate the need for either proof of actual force on the part of the assailant or physical resistance on the part of the victim.[3] We think that, generally, this is the correct standard.

As earlier indicated, the Court of Special Appeals held that a showing of a reasonable apprehension of fear was essential under *Hazel* to establish the elements of the offense where the victim did not resist. The Court did not believe, however, that the evidence was legally sufficient to demonstrate the existence of "a reasonable fear" which overcame Pat's ability to resist. In support of the Court's conclusion, Rusk maintains that the evidence showed that Pat voluntarily entered his apartment without being subjected to a "single threat nor a scintilla of force"; that she made no effort to run away nor did she scream for help; that she never exhibited a will to resist; and that her subjective reaction of fear to the situation in which she had voluntarily placed herself was unreasonable and exaggerated. Rusk claims that his acts were not reasonably calculated to overcome a will to resist; that Pat's verbal resistance was not resistance within the contemplation of *Hazel;* that his alleged menacing look did not constitute a threat of force; and that even had he pulled Pat to the bed, and lightly choked her, as she claimed,

---

**3.** *See* State v. Reinhold, 123 Ariz. 50, 597 P.2d 532 (1979); People v. Hunt, 72 Cal. App. 3d 190, 139 Cal. Rptr. 675 (1977); State v. Dill, 42 Del. 533, 40 A.2d 443 (1944); Arnold v. United States, 358 A.2d 335 (D.C. App. 1976); Doyle v. State, 39 Fla. 155, 22 So. 272 (1897); Curtis v. State, 236 Ga. 362, 223 S.E.2d 721 (1976); People v. Murphy, 124 Ill. App. 2d 71, 260 N.E.2d 386 (1970); Carroll v. State, 263 Ind. 86, 324 N.E.2d 809 (1975); Fields v. State, 293 So. 2d 430 (Miss. 1974); State v. Beck, 368 S.W.2d 490 (Mo. 1963); Cascio v. State, 147 Neb. 1075, 25 N.W.2d 897 (1947); State v. Burns, 287 N.C. 102, 214 S.E.2d 56, *cert. denied,* 423 U.S. 933, 96 S. Ct. 288, 46 L. Ed. 2d 264 (1975); State v. Verdone, 114 R.I. 613, 337 A.2d 804 (1975); Brown v. State, 576 S.W.2d 820 (Tex. Cr. App. 1979); Jones v. Com., 219 Va. 983, 252 S.E.2d 370 (1979); State v. Baker, 30 Wash. 2d 601, 192 P.2d 839 (1948); Brown v. State, 581 P.2d 189 (Wyo. 1978).

Some jurisdictions do not require that the victim's fear be reasonably grounded. *See* Struggs v. State, 372 So. 2d 49 (Ala. Cr. App.), *cert. denied,* 444 U.S. 936, 100 S. Ct. 285, 62 L. Ed. 2d 195 (1979); Kirby v. State, 5 Ala. App. 128, 59 So. 374 (1912); Dinkens v. State, 92 Nev. 74, 546 P.2d 228 (1976), *citing* Hazel v. State, *supra;* State v. Herfel, 49 Wis. 2d 513, 182 N.W.2d 232 (1971). *See also* Salsman v. Com., 565 S.W.2d 638 (Ky. App. 1978); State v. Havens, 264 N.W.2d 918 (S.D. 1978).

these actions, viewed in the context of the entire incident —
no prior threats having been made — would be insufficient
to constitute force or a threat of force or render the
intercourse nonconsensual.

We think the reversal of Rusk's conviction by the Court of
Special Appeals was in error for the fundamental reason so
well expressed in the dissenting opinion by Judge Wilner
when he observed that the majority had "trampled upon the
first principle of appellate restraint . . . [because it had] sub-
stituted [its] own view of the evidence (and the inferences
that may fairly be drawn from it) for that of the judge and
jury . . . [and had thereby] improperly invaded the province
allotted to those tribunals." 43 Md. App. at 484-85. In view
of the evidence adduced at the trial, the reasonableness of
Pat's apprehension of fear was plainly a question of fact for
the jury to determine. *See People v. Merritt,* 64 Ill. App. 3d
482, 381 N.E.2d 407 (1978); *State v. Baldwin,* 571 S.W.2d
236 (Mo. 1978); *People v. Yannucci,* 283 N.Y. 546, 29 N.E.2d
185 (1940); *Schrum v. Commonwealth,* 246 S.E.2d 893 (Va.
1978); *Tryon v. State,* 567 P.2d 290 (Wyo. 1977). The prin-
ciple of these cases was applied in *Giles v. State,* 229 Md.
370, 382, 183 A.2d 359 (1962), a common law rape
prosecution involving conflicting evidence as to the use of
force and lack of consent, where the Court concluded that the
question "whether the intercourse had been consented to or
had been accomplished by force, was clearly one to be
resolved by the trier of facts." *Johnson v. State,* 232 Md. 199,
192 A.2d 506 (1963), another rape case, is to the same effect.
Applying the constitutional standard of review articulated
in *Jackson v. Virginia, supra, i.e.* — whether after con-
sidering the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt —
it is readily apparent to us that the trier of fact could
rationally find that the elements of force and non-consent
had been established and that Rusk was guilty of the offense
beyond a reasonable doubt. Of course, it was for the jury to
observe the witnesses and their demeanor, and to judge their
credibility and weigh their testimony. Quite obviously, the

jury disbelieved Rusk and believed Pat's testimony. From her testimony, the jury could have reasonably concluded that the taking of her car keys was intended by Rusk to immobilize her alone, late at night, in a neighborhood with which she was not familiar; that after Pat had repeatedly refused to enter his apartment, Rusk commanded in firm tones that she do so; that Pat was badly frightened and feared that Rusk intended to rape her; that unable to think clearly and believing that she had no other choice in the circumstances, Pat entered Rusk's apartment; that once inside Pat asked permission to leave but Rusk told her to stay; that he then pulled Pat by the arms to the bed and undressed her; that Pat was afraid that Rusk would kill her unless she submitted; that she began to cry and Rusk then put his hands on her throat and began " 'lightly to choke' " her; that Pat asked him if he would let her go without killing her if she complied with his demands; that Rusk gave an affirmative response, after which she finally submitted.

Just where persuasion ends and force begins in cases like the present is essentially a factual issue, to be resolved in light of the controlling legal precepts. That threats of force need not be made in any particular manner in order to put a person in fear of bodily harm is well established. *Hazel, supra; Dumer v. State,* 64 Wis. 2d 590, 219 N.W.2d 592 (1974). Indeed, conduct, rather than words, may convey the threat. *See People v. Benavidez,* 63 Cal. Rptr. 357, 255 C.A.2d 563 (1967); *State v. Douglas,* 256 La. 572, 237 So. 2d 382, *death sentence vacated,* 408 U.S. 937, 92 S. Ct. 2864, 33 L. Ed. 2d 756 (1970); *State v. Bouldin,* 153 Mont. 276, 456 P.2d 830 (1969); *Blotkamp v. State,* 45 Md. App. 64, 411 A.2d 1068 (1980). That a victim did not scream out for help or attempt to escape, while bearing on the question of consent, is unnecessary where she is restrained by fear of violence. *See People v. Merritt,* 64 Ill. App. 3d 482, 381 N.E.2d 407 (1978); *Holland v. State,* 356 N.E.2d 686 (Ind. App. 1976); *State v. Stevenson,* 195 N.W.2d 358 (Iowa 1972).

Considering all of the evidence in the case, with particular focus upon the actual force applied by Rusk to Pat's neck, we conclude that the jury could rationally find that the essen-

tial elements of second degree rape had been established and that Rusk was guilty of that offense beyond a reasonable doubt.

> *Judgment of the Court of Special Appeals reversed; case remanded to that court with directions that it affirm the judgment of the Criminal Court of Baltimore; costs to be paid by the appellee.*

*Cole, J., dissenting:*

I agree with the Court of Special Appeals that the evidence adduced at the trial of Edward Salvatore Rusk was insufficient to convict him of rape. I, therefore, respectfully dissent.

The standard of appellate review in deciding a question of sufficiency, as the majority correctly notes, is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original); *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980). However, it is equally well settled that when one of the essential elements of a crime is not sustained by the evidence, the conviction of the defendant cannot stand as a matter of law.

The majority, in applying this standard, concludes that "[i]n view of the evidence adduced at the trial, the reasonableness of Pat's apprehension of fear was plainly a question of fact for the jury to determine." In so concluding, the majority has skipped over the crucial issue. It seems to me that whether the prosecutrix's fear is reasonable becomes a question only after the court determines that the defendant's conduct under the circumstances was reasonably calculated to give rise to a fear on her part to the extent that she was unable to resist. In other words, the fear must stem from his articulable conduct, and equally, if not more importantly,

cannot be inconsistent with her own contemporaneous reaction to that conduct. The conduct of the defendant, in and of itself, must clearly indicate force or the threat of force such as to overpower the prosecutrix's ability to resist or will to resist. In my view, there is no evidence to support the majority's conclusion that the prosecutrix was forced to submit to sexual intercourse, certainly not fellatio.

This Court defined rape in *Hazel v. State,* 221 Md. 464, 468-69, 157 A.2d 922 (1960), as "the act of a man having unlawful carnal knowledge of a female over the age of ten years by force without the consent and against the will of the victim." The Court went on to declare that "[f]orce is an essential element of the crime and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety." 221 Md. at 469. We noted that "no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend upon the prevailing circumstances." *Id.* However, we hastened to add that "[i]f the acts and threats of the defendant [are] reasonably calculated to create in the mind of the victim — having regard to the circumstances in which she [is] placed — a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force." *Id.*

To avoid any confusion about the substantive law to be applied, we further stated in *Hazel* that while

> [t]he authorities are by no means in accord as to what degree of resistance is necessary to establish the absence of consent ... the generally accepted doctrine seems to be that a female — who was conscious and possessed of her natural, mental and physical powers when the attack took place — must have resisted to the extent of her ability at the time, unless it appears that she was overcome by numbers or so terrified by threats as to overcome her will to resist. [221 Md. at 469-70.]

By way of illustration, we cited certain cases. In *State v. Thompson,* 227 N.C. 19, 40 S.E.2d 620 (1946), the victim and her friend, Straughan, were riding in a car which stalled and could not be started again even with the help of the defendants, who were strangers. One of the defendants persuaded Straughan to accompany him down the road to get a chain for the purpose of towing the car. After Straughan and one defendant left, the other three forcibly took the victim from her car into an unfinished house, a block away, and each had intercourse with her. The victim did not object to intercourse with the three defendants because she was frightened and afraid they would kill her. In addition, it was plainly a jury question whether the prosecutrix was "[i]n such place and position that resistance would have been useless." 40 S.E.2d at 625 (quoting *Mills v. United States,* 164 U.S. 644, 649, 17 S. Ct. 210, 41 L. Ed. 584 (1879)).

In *State v. Dill,* 3 Terry 533, 40 A.2d 443 (Del. 1944), the State produced evidence to show that the victim, her husband, and two children were impeded in their return home when their automobile stalled on the highway near a tavern. The husband got out and began walking home for gas, leaving his wife and two children in the car. Sometime later, the defendant happened upon the scene and induced the wife to let him take her in his automobile for the purpose of overtaking her husband along the road. Instead, the defendant drove his car off the highway into a private lane. When the car stopped, the wife got out of the car and attempted to flee but was overtaken by the defendant who on the grass plot between the two highway lanes had sexual intercourse with her.

The trial judge, in submitting the case to the jury, instructed them, in part, as follows:

> In the absence of excusing circumstances it must be shown that the woman did resent the attack made upon her in good faith and without pretense, with an active determination to prevent the violation of her person, and was *not merely passive and perfunctory in her resistance.* [40 A.2d at 445.] [Emphasis supplied.]

In *State v. Hoffman*, 228 Wis. 235, 280 N.W. 357 (1938), the complaining witness entered the defendant's car under friendly circumstances and was driven out into the country without protest. When the defendant made his advances she shouted she was going home, pulled away from him and ran. He caught up with her and there was a tussle; she fell and tried to kick him. Again she ran and he caught her and said "if you run again I will choke you and throw you in the ditch. . . ." 280 N.W. at 360. After that she walked with him back to the car. He did not order her to get in, but begged her. No force was used thereafter. Finally, she consented and acquiesced in the events which followed. At trial the complainant testified she was terribly frightened. Nevertheless the court concluded:

> Suffice it to say that we have painstakingly read and re-read her testimony with the result that in our opinion it falls far short of proving that resistance which our law requires, unless her failure to resist was excused because of a fear of death or of great bodily harm or unless she was so terrified as to be unable to resist the defendant. It is apparently conceded by the State that her resistance was insufficient to prove the crime of rape unless her acquiescence or submission to the defendant was the result of that fear which our settled rules require. From the testimony of the complaining witness, it appears that she was fully cognizant of everything that was going on, fully able to relate every detail thereof and that she was in no reasonable sense dominated by that fear which excused the "utmost resistance" within her power.
>
> While the evidence is well calculated to arouse keen indignation against the defendant who so persistently and importunately pursued the complaining witness, who at that time was a virgin, it falls short, in our opinion, of proving a case of rape. [280 N.W. at 360-361.]

In *Selvage v. State,* 148 Neb. 409, 27 N.W.2d 636 (1947), an 18-year-old woman went to a dance with her brother and later decided to go to a cafe with the defendants and some other acquaintances. They drove to a ball park several blocks away where she and the defendant and another got out. The others in the car drove away. She and the two males walked about a block into the park; she refused their advances for intercourse. She claimed they threw her to the ground, held her while they took turns having sexual intercourse. While this was going on a car with its lights on drove up and the two young men hurried some distance away from her. She made no outcry, nor attempted to communicate with the people in this car. Later at a different place in the park, she claimed each had intercourse with her again. The three walked back to the cafe, drank coffee, and waited to get a car to take them to the city near her home. When they finally got a car, she testified the two repeated the acts of intercourse with her. She resisted but made no complaint to those riding in the front seat. When she got home she related to her parents what had happened.

The Supreme Court of Nebraska, in holding the evidence insufficient to convict for rape, said:

> Resistance or opposition by mere words is not enough; the resistance must be by acts, and must be reasonably proportionate to the strength and opportunities of the woman. She must resist the consummation of the act, and her resistance must not be a mere pretense, but must be in good faith, and must persist until the offense is consummated. [27 N.W.2d at 637.]

In *Kidd v. State,* 97 Okla. Crim. 415, 266 P.2d 992 (1953), the rape took place in a car in an isolated spot. One assailant in that case told the victim that if she did not shut up he would kill her with a beer bottle. "By the time [the defendant] took over," the court concluded, "this victim was whipped down and demoralized." 266 P.2d at 1001.

These cases make plain that *Hazel* intended to require clear and cognizable evidence of force or the threat of force

sufficient to overcome or prevent resistance by the female before there would arise a jury question of whether the prosecutrix had a reasonable apprehension of harm.* The majority today departs from this requirement and places its imprimatur on the female's conclusory statements that she was in fear, as sufficient to support a conviction of rape.

It is significant to note that in each of the fourteen reported rape cases decided since *Hazel,* in which sufficiency of the evidence was the issue, the appellate courts of this State have adhered to the requirement that evidence of force or the threat of force overcoming or preventing resistance by the female must be demonstrated on the record to sustain a conviction. In two of those cases, *Goldberg v. State,* 41 Md. App. 58, 395 A.2d 1213, *certiorari dismissed as improvidently granted,* September 18, 1979, and *Winegan v. State,* 10 Md. App. 196, 268 A.2d 585 (1970), the convictions were reversed by the Court of Special Appeals. *Goldberg* concerned a student, professing to be a talent agent, who lured a young woman to an apartment upon the pretext of offering her a modeling job. She freely accompanied him, and though she protested verbally, she did not physically resist his advances. The Court of Special Appeals held:

> The prosecutrix swore that the reasons for her fear of being killed if she did not accede to appellant's advances were two-fold: 1) she was alone with the appellant in a house with no buildings close by and no one to help her if she resisted, and 2) the appellant was much larger than she was. In the complete absence of any threatening words or actions by the appellant, these two factors, as a matter of law, are simply not enough to have created a reasonable fear of harm so as to preclude resistance and be "the equivalent of force". (*Hazel v. State, supra,* at 469.) Without proof of force, actual or constructive, evidenced by words or conduct of the defendant or those acting in consort with him, sexual intercourse is not rape. [41 Md. App. at 69.] [Footnote omitted.]

---

* See the attached Appendix for a further recitation of cases which support this view.

In *Winegan,* the appellant's conviction was reversed because, although the prosecutrix accompanied him to a boarding house and had sexual intercourse only because she thought he had a gun, *he in fact had no gun nor at any time claimed to have one.* It was on this basis, coupled with the facts that (1) the complainant at no time made outcry and (2) *she followed him up the steps to his room,* that the court concluded that her fear, if actually present, was so unreasonable as to preclude a conviction for rape.

Of the other twelve cases, four from this Court, not one contains the paucity of evidence regarding force or threat of force which exists in the case *sub judice.* In *Johnson, Jr. v. State,* 232 Md. 199, 192 A.2d 506 (1963), the court stated that although there was some evidence tending to indicate consent, which, standing alone, might have justified a judgment of acquittal, there was also evidence of violent acts and verbal threats on the part of the appellant, which, if believed, would have been the equivalent of such force as was reasonably calculated to create the apprehension of imminent bodily harm which could have impaired or overcome the victim's will to resist. In that case, the court related:

> The acts alluded to took place at the parked car. The jury had testimony before it that obscene remarks and threats were directed to her and [her companion] while they were locked in the car, and that rocks were thrown at the windows, breaking them. [The prosecutrix] testified that one of the three men suggested shooting [her companion]. The victim may have submitted to sexual relations but that does not necessarily imply consent. [232 Md. at 204.]

In *Thompson v. State,* 230 Md. 113, 186 A.2d 461 (1962), the victim was murdered and there was no question whether the act had been accomplished by force. The woman died as a result of injuries she sustained.

In *Giles v. State,* 229 Md. 370, 183 A.2d 359 (1962), *appeal dismissed,* 372 U.S. 767, 83 S. Ct. 1102, 10 L. Ed. 2d 137

(1963), as in *Johnson,* there was some evidence tending to indicate consent, "[b]ut there was also evidence of violent acts and verbal threats on the part of the defendants, which, if believed, would have been the equivalent of such force. . . ." 229 Md. at 381.

In *Lipscomb v. State,* 223 Md. 599, 165 A.2d 918 (1960), as in *Thompson,* the victims were killed in the attempt or perpetration of rape.

In *Blotkamp v. State,* 45 Md. App. 64, 411 A.2d 1068 (1980), the Court of Special Appeals upheld a rape conviction in a case in which the victim was physically harmed in the assault. She "received substantial injuries to her genital area, requiring as noted, surgical suturing. *This was force, raw, actual force; unnecessary force; force beyond that normally involved in completing the coital act."* 45 Md. App. at 70 (emphasis supplied). In addition, the assailant made "pointed and repeated reference to having a knife, [which,] under the circumstances in which it was made, was certainly calculated — reasonably calculated — to create in [the victim's] mind a real apprehension of serious and imminent bodily injury if she did not comply. . . ." 45 Md. App. at 70-71. At the time, the court concluded, the victim was absolutely helpless.

In *Briscoe v. State,* 40 Md. App. 120, 388 A.2d 153, *cert. denied,* 283 Md. 730 (1978), the facts were similar to those in *Hazel.* The assailant broke into the victim's home, pointed a shotgun at her and tied her up.

In *Dove v. State,* 33 Md. App. 601, 365 A.2d 1009 (1976), "the victim tried to run, but was leaped upon and smothered when she fell. There [was] nothing to indicate she would not have been injured more substantially if she had continued to resist his advances." 33 Md. App. at 617.

Along the same lines was *Burnette v. State,* 15 Md. App. 371, 290 A.2d 816 (1972). The victim "was alone with appellant who in a lonely spot assaulted and beat her." 15 Md. App. at 377. And in *Coward v. State,* 10 Md. App. 127, 268 A.2d 508, *cert. denied,* 259 Md. 730 (1970), the victim was driven to a wooded area by two men, and the driver threatened to break her neck.

In *Rice v. State,* 9 Md. App. 552, 267 A.2d 261, *cert. denied,* 259 Md. 735 (1970), it was explained: "Where, as here, a woman submits to a stranger who has forced his way into her home and manhandled her, we do not look upon the case with the same eye as when intercourse occurs after an initially friendly encounter." 9 Md. App. at 560.

And in *Walter v. State,* 9 Md. App. 385, 264 A.2d 882, *cert. denied,* 258 Md. 731 (1970), and *Lucas v. State,* 2 Md. App. 590, 235 A.2d 780, *cert. denied,* 249 Md. 732 (1968), the circumstances were also persuasive to show fear induced by force or threats. In *Walter* a police officer subdued a woman who, realizing he had a gun, became hysterical. She was also afraid of his abrupt tone of voice. The court concluded that it was "apparent the accused deliberately placed the victim in a situation where she would be afraid, with the expectation she would thereby yield to his lustful demands without physical resistance." 9 Md. App. at 395. In *Lucas* the perpetrator threatened the victim and her four infant children with a knife.

In each of the above 12 cases there was either physical violence or specific threatening words or conduct which were calculated to create a very real and specific fear of *immediate* physical injury to the victim if she did not comply, coupled with the apparent power to execute those threats in the event of non-submission.

While courts no longer require a female to resist to the utmost or to resist where resistance would be foolhardy, they do require her acquiescence in the act of intercourse to stem from fear generated by something of substance. She may not simply say, "I was really scared," and thereby transform consent or mere unwillingness into submission by force. These words do not transform a seducer into a rapist. She must follow the natural instinct of every proud female to resist, by more than mere words, the violation of her person by a stranger or an unwelcomed friend. She must make it plain that she regards such sexual acts as abhorrent and repugnant to her natural sense of pride. She must resist unless the defendant has objectively manifested his intent to use physical force to accomplish his purpose. The law

regards rape as a crime of violence. The majority today attenuates this proposition. It declares the innocence of an at best distraught young woman. It does not demonstrate the defendant's guilt of the crime of rape.

My examination of the evidence in a light most favorable to the State reveals no conduct by the defendant reasonably calculated to cause the prosecutrix to be so fearful that she should fail to resist and thus, the element of force is lacking in the State's proof.

Here we have a full grown married woman who meets the defendant in a bar under friendly circumstances. They drink and talk together. She agrees to give him a ride home in her car. When they arrive at his house, located in an area with which she was unfamiliar but which was certainly not isolated, he invites her to come up to his apartment and she refuses. According to her testimony he takes her keys, walks around to her side of the car, and says "Now will you come up?" She answers, "yes." The majority suggests that "from her testimony the jury could have reasonably concluded that the taking of her keys was intended by Rusk to immobilize her alone, late at night, in a neighborhood with which she was unfamiliar. . . ." But on what facts does the majority so conclude? There is no evidence descriptive of the tone of his voice; her testimony indicates only the bare statement quoted above. How can the majority extract from this conduct a threat reasonably calculated to create a fear of imminent bodily harm? There was no weapon, no threat to inflict physical injury.

She also testified that she was afraid of "the way he looked," and afraid of his statement, "come on up, come on up." But what can the majority conclude from this statement coupled with a "look" that remained undescribed? There is no evidence whatsoever to suggest that this was anything other than a pattern of conduct consistent with the ordinary seduction of a female acquaintance who at first suggests her disinclination.

After reaching the room she described what occurred as follows:

I was still begging him to please let, you know, let me leave. I said, "you can get a lot of other girls down there, for what you want," and he just kept saying, "no," and then I was really scared, because I can't describe, you know, what was said. It was more the look in his eyes; and I said, at that point — I didn't know what to say; and I said, "If I do what you want, will you let me go without killing me?" Because I didn't know, at that point, what he was going to do; and I started to cry; and when I did, he put his hands on my throat and started lightly to choke me; and I said "If I do what you want, will you let me go?" And he said, yes, and at that time, I proceeded to do what he wanted me to.

The majority relies on the trial court's statement that the defendant responded affirmatively to her question "If I do what you want, will you let me go without killing me?" The majority further suggests that the jury could infer the defendant's affirmative response. The facts belie such inference since by the prosecutrix's own testimony the defendant made *no* response. *He said nothing!*

She then testified that she started to cry and he "started lightly to choke" her, whatever that means. Obviously, the choking was not of any persuasive significance. During this "choking" she was able to talk. She said "If I do what you want will you let me go?" It was at this point that the defendant said yes.

I find it incredible for the majority to conclude that on these facts, without more, a woman was *forced* to commit oral sex upon the defendant and then to engage in vaginal intercourse. In the absence of any verbal threat to do her grievous bodily harm or the display of any weapon and threat to use it, I find it difficult to understand how a victim could participate in these sexual activities and not be willing.

What was the nature and extent of her fear anyhow? She herself testified she was "fearful that maybe I had someone following me." She was afraid because she didn't know him

and she was afraid he was going to "rape" her. But there are no acts or conduct on the part of the defendant to suggest that these fears were created by the defendant or that he made any objective, identifiable threats to her which would give rise to this woman's failure to flee, summon help, scream, or make physical resistance.

As the defendant well knew, this was not a child. This was a married woman with children, a woman familiar with the social setting in which these two actors met. It was an ordinary city street, not an isolated spot. He had not forced his way into her car; he had not taken advantage of a difference in years or any state of intoxication or mental or physical incapacity on her part. He did not grapple with her. She got out of the car, *walked with him* across the street and *followed* him up the stairs to his room. She certainly had to realize that they were not going upstairs to play *Scrabble.*

Once in the room she waited while he went to the bathroom where he stayed for five minutes. In his absence, the room was lighted but she did not seek a means of escape. She did not even "try the door" to determine if it was locked. She waited.

Upon his return, he turned off the lights and pulled her on the bed. There is no suggestion or inference to be drawn from her testimony that he yanked her on the bed or in any manner physically abused her by this conduct. As a matter of fact there is no suggestion by her that he bruised or hurt her in any manner, or that the "choking" was intended to be disabling.

He then proceeded to unbutton her blouse and her bra. He did not rip her clothes off or use any greater force than was necessary to unfasten her garments. He did not even complete this procedure but requested that she do it, which she did "because he asked me to." However, she not only removed her clothing but took his clothes off, too.

Then for a while they lay together on the bed kissing, though she says she did not return his kisses. However, without protest she then proceeded to perform oral sex and later submitted to vaginal intercourse. After these activities

were completed, she asked to leave. They dressed and he walked her to her car and asked to see her again. She indicated that perhaps they might meet at Fells Point. He gave her directions home and returned to his apartment where the police found him later that morning.

The record does not disclose the basis for this young woman's misgivings about her experience with the defendant. The only substantive fear she had was that she would be late arriving home. The objective facts make it inherently improbable that the defendant's conduct generated any fear for her physical well-being.

In my judgment the State failed to prove the essential element of force beyond a reasonable doubt and, therefore, the judgment of conviction should be reversed.

Judges Smith and Digges have authorized me to state that they concur in the views expressed herein.

## APPENDIX

In the following cases rape convictions were overturned because the requirement of force necessary to affirmatively demonstrate lack of consent was not strictly complied with, or the facts were so sketchy or inherently improbable that this element could not be established, as a matter of law, beyond a reasonable doubt.

In *Zamora v. State,* 449 S.W.2d 43 (Tex. Crim. App. 1969), it was held that the evidence was insufficient to sustain a conviction of rape by force and threats where the sixteen-year-old prosecutrix, who had been engaging in sexual relations with the defendant stepfather for about six years, went to his bedroom to take him coffee, did not try to leave, took off part of her clothes at his request, made no outcry, and did not resist in any way, even though she knew what was going to happen when she sat on the bed. On appeal reference was made to certain threats which, if sufficient, would have excused the complainant's failure to resist. The defendant threatened to put the girl in a juvenile home and to whip her younger brother and sisters if she told her

mother. But the court explained, "the threats that were made occurred after the alleged act and *were not made to cause the prosecutrix to yield,* but to prevent her from informing her mother." 449 S.W.2d at 47 (emphasis supplied). The conviction was reversed.

In *People v. Bales,* 74 Cal. App. 2d 732, 169 P.2d 262 (1946), the complaining witness testified that she met the appellant in a bar and later he physically forced her into his car and drove off. (The evidence in this respect was sufficient to sustain a charge of kidnapping.) Appellant next drove the woman down the highway and stopped the car off the road. He "came around to her side, and make a remark to the effect that he would then find out what kind of woman she was." 169 P.2d at 264. She testified "that she was 'afraid' of the threat." *Id.* The court concluded:

> There is an entire absence of evidence that she voiced any objection, made any appeal for help or tried to fight or struggle. There is no evidence of any force or threat by the appellant at that time, and no substantial evidence of any apprehension of imme-diate bodily harm accompanied by apparent power of execution. The evidence material to his charge fails to show either any reasonable resistance or any reasonable excuse for its absence. The old rule that there must be resistance to the utmost has been relaxed (*People v. Cline,* 117 Cal. App. 181, 3 P.2d 575), but not to the extent of doing away with the need of showing some resistance or, in proper cases, showing facts which fairly indicate some good reason for not resisting. [169 P.2d at 265.]

In *Farrar v. United States,* 275 F.2d 868 (D.C. Cir. 1959), *opinion amended* (1960), the words of Chief Judge Prettyman, speaking for the court, are better left to speak for themselves:

> As I understand the law of rape, if no force is used and the girl in fact acquiesces, the acquiescence may nevertheless be deemed to be non-consent if it

is induced by fear; but the fear, to be sufficient for this purpose, must be based upon something of substance; and furthermore the fear must be of death or severe bodily harm. A girl cannot simply say, "I was scared," and thus transform an apparent consent into a legal non-consent which makes the man's act a capital offense. She must have a reasonable apprehension, as I understand the law, of something real; her fear must be not fanciful but substantial.

In the case at bar there was an apparent acquiescence on the girl's part. She said she took off all her clothes, lay down on the bed, and had intercourse twice, some forty-five minutes apart. But she said she did this because she was scared. And she was quite clear, emphatic and insistent upon the cause of her fear; the man had a knife in his hand. The reason for her fear was tangible and definite. It was a knife, and it was in his hand. She so testified repeatedly.

But she never saw any knife. Now it is perfectly apparent that, if this man had had a knife in his hand while he was doing all the things she said he did over this two or three hour period, she must have seen it. He could not have had a knife and have done all these things, with her watching him as she said she did, without her seeing the knife. As a matter of fact, at the close of the Government's testimony the trial judge struck from the record all the testimony concerning the knife, "leaving her testimony in that it was something that felt sharp and felt like a knife." The judge said if there had been a knife the girl would have seen it.

. . .

Upon the foregoing facts and circumstances, when the knife disappeared from the record as a possible fact, the charge of rape disappeared, as I view the matter. The only basis for fear advanced by the prosecutrix was the knife; she suggested no alternative cause for fear. The only factual substance to

any of the intangible threats allegedly made by him to her was the knife. There was no force or violence and no threat or fear of force or violence except for the knife. The charge of rape rested upon the presence of the knife. The Government failed to prove a case of rape. [275 F.2d at 876-77.] [Footnotes omitted.]

In *Gonzales v. State,* 516 P.2d 592 (Wyo. 1973), the complaining witness was 33 years old and the divorced mother of three children. She was working in a bar and defendant, someone she knew, came in shortly before closing and had been drinking. He asked her for a ride home and she refused, but he followed her and got into her car anyway. She testified she was nervous and scared at the time and made no further protest nor signalled with her horn. On a side road "[h]e asked her to stop 'to go to the bathroom' and took the keys out of the ignition, telling her she would not drive off and leave him. She stayed in the car. . . ." 516 P.2d at 593.

When he returned he told her he was going to rape her and she kept trying to talk him out of it. He told her he was getting mad at her and then put his fist against her face and said, "I'm going to do it. You can have it one way or the other." [*Id.*]

There were no other threats. The witness testified she knew defendant's temper and was scared of him. She related several previous incidents to sustain her knowledge of his temper. The court concluded, "This is not a firm basis upon which to sketch a man of violence and one who would inspire fear." 516 P.2d at 593-94. It should be noted that although the conviction was reversed on other grounds, the court concluded that:

[i]nasmuch as the case must be retried in conformity with these principles [having quoted from *Farrar* and cited *Winegan v. State,* 10 Md. App. 196, 268 A.2d 585 (1970)] we do not deem it amiss to state it is not entirely fair to a trial court or to the defendant to rely on the sketchy showing and lack of detail presented at this trial. [516 P.2d at 595.]

There are a number of other cases in which the threats relied upon were found insufficient. In *State v. Horne*, 12 Utah, 2d 162, 364 P.2d 109 (1961), the prosecutrix was a 21-year-old married woman with two young children. They lived in a trailer. The defendant and she were acquainted, and he had visited her on previous occasions. On this particular night he entered her trailer uninvited and stated he was going to make love to her. She protested, she struggled, and her little girl, who had been asleep in her mother's bed, awoke and began crying. Finally he let her go to the bathroom and she refused to come out. He came and got her and they struggled some more. Eventually she gave in. She testified she was afraid for her children.

The court set forth the rule to be applied and applied it to the facts:

> The old rule of "resistance to the utmost" is obsolete. The law does not require that the woman shall do more than her age, strength, the surrounding facts, and all attending circumstances make reasonable for her to do in order to manifest her opposition. However, in determining the sufficiency of the evidence, there must be considered the ease of assertion of the forcible accomplishment of the sexual act, with impossibility of defense except by direct denial, or of the proneness of the woman, when she finds the fact of her disgrace discovered or likely of discovery to minimize her fault by asserting force or violence, which had led courts to hold to a very strict rule of proof in such cases.
> . . .
> The prosecutrix did not attempt to leave the trailer to seek help, although she had ample opportunity. When she went to the bathroom the defendant, according to her testimony, had already removed his pants and had made indecent proposals and advances. Yet, she did not avail herself of the opportunity to seek help. It is the natural impulse of every honest and virtuous female to flee from threatened outrage. Her explanation that she did

not want to leave the children alone with the defendant is a rather weak one, to say the least. It would have taken less than a minute to rouse her neighbors. Furthermore, she left the defendant with the children for 10 to 15 minutes while she was in the bathroom.

. . .

There was no evidence of any threats made to either the prosecutrix or her children.

We have carefully evaluated the testimony of the prosecutrix and conclude that it is so inherently improbable as to be unworthy of belief and that, upon objective analysis, it appears that reasonable minds could not believe beyond a reasonable doubt that the defendant was guilty. The jury's verdict cannot stand. [364 P.2d at 112-13.] [Footnotes omitted.]

In *Johnson v. State,* 118 So. 2d 806 (Fla. Dist. Ct. App. 1960), the evidence was insufficient to sustain a jury finding that the prosecutrix was forced against her will to have intercourse with defendant or that her fear was sufficient for the jury to find that defendant was guilty of rape through fear. In this case an eighteen-year-old high school student accepted a ride home from an acquaintance, which eventually led to her seduction. At no time did the defendant threaten her with any weapon. She screamed, but did not resist in any other way, nor attempt to flee. Quoting from *State v. Remley,* 237 S.W. 489, 492 (Mo. 1922), the Florida court stated:

The statements of plaintiff as to this occurrence must be viewed in the light of all the surrounding facts and circumstances. If the physical facts and all the circumstances appearing in evidence, together with the surrounding conditions, absolutely negative and destroy the force of such statements, then, in contemplation of law, such statements do not amount to any substantial evidence of the facts

to which they relate. We do not mean by this fact that the prosecutrix must be corroborated, for such is not the law of this State. *State v. Marcks,* 140 Mo. 656, [41 S.W. 973, 43 S.W. 1095]. But we do hold that statements made by a witness that are not only in conflict with the experience of common life and of the ordinary instincts and promptings of human nature, but negatived as well by the conduct of the witness, and the conditions and circumstances surrounding the occurrence to which they have application, are not sufficient to support the grave and serious charge of rape, and this is true whether the charge is made in either a civil or criminal proceeding. [118 So. 2d at 815-16.]

And in *People v. Blevins,* 98 Ill. App. 2d 172, 240 N.E.2d 434 (1968), the evidence was insufficient where there were unexplained inconsistencies in the prosecution's case and the defendant was found peacefully asleep at the scene of the "crime" when arrested.

Even in the closest cases which have been upheld by other jurisdictions there existed more evidence of threat-induced fear of imminent bodily harm than existed in the present case.

In *Brown v. State,* 59 Wis. 200, 207 N.W.2d 602 (1973), the defendant threatened his victim with a water pistol. She had reason to believe it was real, and reason to believe he would shoot her if she did not comply.

In *Johnson v. United States,* 426 F.2d 651, 654 (D.C. Cir. 1970), the victim's failure to resist "was based on a *general fear of her assailant* who had dragged her from her car, kept his arm around her neck when they stopped for gas, drove her to a deserted location and told her it would be useless for her to scream because no one would hear." (Emphasis in original.)

In *Brown v. State,* 581 P.2d 189 (Wyo. 1978), the victim was treated very roughly and bruised. She didn't resist because she was three or four months pregnant (which the defendant knew) and because she was afraid for both her own and her baby's lives.

In *Tryon v. State,* 567 P.2d 290 (Wyo. 1970), the victim did not resist, out of fear. Although he did not threaten her, the conviction was sustained. The court explained:

> We find here a child afraid of the dark alone with this defendant several miles from her home, very late at night — and with a man whom she knew had been drinking and quarreling with the woman for whom she had been baby-sitting. We cannot help but suggest that all of these elements could totally terrify a child of tender years or that the jury could have so reasonably inferred.
>
> . . .
>
> Although the defendant did not express threats, wielded no weapons, and did not strike the victim, the force applied when considered in light of the facts previously related is sufficient to support the jury's finding of non-consent. [567 P.2d at 292-93.]